# OCTOBER, 1934

## V. A. LOMBARDO V. CITY OF DALLAS ET AL.

No. 6251.  Decided June 30, 1934.
Motion for rehearing overruled October 24, 1934.
(73 S. W., 2d Series, 475.)

2

*W. S. Bramlett, J. T. Kelly* and *Angelo Piranio,* all of Dallas, for plaintiff in error.

The ordinances of the defendant city relied on as defensive matter are void and without force and effect as applied to the property of Lombardo, for that, the legislative act of the State of Texas upon which the same rests does not delegate to the defendant city the power to prohibit the use of plaintiff's property as by him proposed but delegated only the power to regulate such use and the power to regulate thus delegated does not include the power to absolutely prohibit his using it for the purpose proposed. Simpkins v. State, 35 Okla. Cr., 143, 249 Pac., 168; Dart v. City of Gulfport, 147 Miss., 534; 113 So., 441; Miller v. Jones, 80 Ala., 89; People v. Gadway, 61 Mich., 285, 28 N. W., 101.

That said act of the legislature is unconstitutional in that it attempts to delegate to the governing authorities of the city the power or pretended power to absolutely prohibit Lombardo from using his property for any purpose other than that of a residence. Smith v. Cahoon, 283 U. S., 553, 51 Sup. Ct., 582, 75 L. Ed., 1264; Houston & T. C. Ry. Co. v. Dallas, 98 Texas, 396, 84 S. W., 648.

The zoning Act of the Legislature or the zoning ordinance of the City of Dallas plead as a matter of defense are not an admissible exercise of the police power of the State. Spann v. City of Dallas, 111 Texas, 350, 212 S. W., 513; Dobbins v. Los Angeles, 195 U. S., 223, 25 Sup. Ct., 18, 49 L. Ed., 169; State v. Redmon, 134 Wis., 89, 114 N. W., 137.

*Hugh S. Grady,* City Attorney, *A. A. Long, H. P. Kucera* and *W. Hughes Knight,* Assistants City Attorney, *Jas. J. Collins* and *A. J. Thuss,* all of Dallas, for defendant in error.

The zoning ordinance of the City of Dallas is a valid exercise of police power expressly authorized by a valid enactment of the Legislature of the State of Texas, and does not constitute an absolute prohibition of the rights of the plaintiff in error to use his property as distinguished from a regulation of

the use of the property. Scott v. Champion Bldg. Co., 28 S. W. (2d) 178; American Wood Products Co. v. City of Minneapolis, 35 Fed. (2d) 657, and other cases cited in the opinion.

The zoning ordinance of the City of Dallas is not discriminatory as to plaintiff and his property by virtue of the fact that other properties within the City of Dallas are not restricted against use for business purposes, or by virtue of the fact that a business establishment is permitted on nearby property where such business establishment existed at the time the zoning ordinance was passed. City of Lacrosse v. Elbertson, 205 Wis., 207, 237 N. W., 99; State ex rel. Manhein v. Harrison, Bldg. Insp., 164 La., 564, 114 So., 159; Koch v. City of Toledo, 37 Fed. (2d) 336.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This case is before us by writ of error and involves primarily the validity of the zoning statutes of the State and the zoning ordinance of the City of Dallas. Both were upheld by the Court of Civil Appeals in an able opinion by Associate Justice Looney. 47 S. W. (2d) 495. We refer to that opinion for a sufficient statement of the case.

The legislative act, by virtue of which the zoning ordinance was adopted, was enacted in 1927 (Acts, 40th Legislature, page 424, chapter 283) and may be found as Articles 1011a to 1011j of Vernon's statutes. The first three of the articles are the ones which contain the grants of power and are vitally involved in the case before us. These three articles read as follows:

"'Art. 1011a. For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body of cities and incorporated villages is hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes.

"Art. 1011b. For any or all of said purposes the local legislative body may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of this Act; and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of such buildings, structures, or land. All such regulations shall be uniform for each class or kind of

buildings throughout each district, but the regulations in one district may differ from those in other districts.

"Art. 1011c. Such regulations shall be made in accordance wth a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic, and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality, and it is hereby provided that this Act shall not enable cities and incorporated villages aforesaid to require the removal or destruction of property, existing at the time such city or incorporated village shall take advantage of this Act, actually and necessarily used in a public service business."

The articles of the statute which follow the above contain elaborate provisions relative to the exercise of the power of zoning by a municipality, but since these are not involved, except as they are a part of the ones we have previously quoted, we shall not quote them, nor make a full statement with reference thereto. It is to be observed from the articles quoted that the zoning power is to be exercised for the purpose of promoting health, safety, morals, or the general welfare of the community, and that the zoning power of the municipality is to be exercised in accordance with some comprehensive plan designed:

(a) "To lessen congestion in the streets";

(b) "To secure safety from fire, panic and other dangers";

(c) "To promote health and general welfare";

(d) To provide adequate light and air";

(e) "To prevent the over-crowding of land";

(f) "To avoid undue concentration of population";

(g) "To facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements."

■ By the terms of Article 1011b it is obvious that the city may exercise the powers granted by dividing the municipality into districts and within the districts "it may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land," etc. It is clear from a reading of this statute that the insistence that it is not broad enough to authorize the exclusion of business enterprises or gasoline filling stations from a residential district is untenable. The language employed is sufficient for such purpose. Dillon on Municipal Corporations (5th ed.), Vol. 2, sec. 665, p. 1002; Buffalo v. Webster, 10 Wend., 100; Cronin v. People, 82 N. Y., 318; Ex parte Byrd, 84 Ala., 17; State v. Beattie, 16 Mo. App., 131; Jacksonville v. Ledwith, 26 Fla., 163; People v. Pratt, 129 N. Y., 68. See also many additional cases cited by Dillon. Chicago v. Stratton, 162 Ill., 494; St. Louis v. Russell, 116 Mo., 248.

The City of Dallas in compliance with the statute, and in accordance with a comprehensive plan, zoned the city. In the first section of the zoning ordinance the City declares:

"SECTION 1. *Purpose.* The zoning regulations and districts as herein established have been made in accordance with a comprehensive plan for the purpose of promoting health, safety, morals and the general welfare of the community. They have been designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water sewerage, schools, parks and other public requirements. They have been made with reasonable consideration, among other things, to the character of the district, and its peculiar suitability for the particular uses; and with a view of conserving the value of buildings and encouraging the most appropriate use of land throughout the community."

Section 2 of the ordinance divided the city into zones and declared that except as provided in the ordinance no building should be erected or structurally altered except in conformity with the regulations prescribed for the use of area district in which such building was located. This section, in part, reads:

"SECTION 2. *General.* Zoning regulations and districts as herein set forth are approved and established. The City of Dallas is hereby divided into six classes of use districts, termed respectively, Dwelling Districts, Apartment Districts, Local Retail Districts, Commercial Districts, First Manufacturing

Districts, and Second Manufacturing Districts; and into six classes of area districts, termed respectively, A Area Districts, B Area Districts, C Area Districts, D Area Districts, E Area Districts and F Area Districts; all as shown on the zoning map which accompanies this Ordinance and is hereby declared to be a part thereof."

Following this section of the ordinance the various districts designated are defined. Section 3 defines a dwelling district, the one primarily involved in this litigation, as follows:

"SECTION 3. *Dwelling District.* In a dwelling district no building or premises shall be used, and no builing shall be erected or structurally altered which is arranged or designed to be used, for other than one or more of the following uses:

(1)  One-family dwelling. Two-family dwelling.

(2)  Church. School or college. Library.

(3)  Private club, excepting a club the chief activity of which is a service customarily carried on as a business. Little Theatre operated as an educational institution and not for profit.

(4)  Public park or playground. Golf course. Public recreation building. Public museum. Community building.

(5)  Telephone exchange, providing no public business office and no repair or storage facilities are maintained. Fire station.

(6)  Water supply reservoir, filter-bed, tower or artesian well.

(7)  Railway passenger station or railway right-of-way, not including railway yards.

(8)  Farm. Truck garden. Nursery. Greenhouse.

(9)  Accessory buildings, including one private garage when located not less than 60 feet from the front lot line, and not less than 20 feet back from any other street line, or located in a compartment as an integral part of the main building.

(10)  Uses customarily incident to any of the above uses when located upon the same lot and not involving the conduct of a business; including customary home occupations engaged in by the occupants of

the dwelling on the premises and including also the office of a physician, surgeon, dentist, musician, or artist when situated in the same dwelling used by such physician, surgeon, dentist, musician, or artist as his or her private dwelling; provided no name plate exceeding one square foot in area containing the name and occupation of the occupant of the premises, and no sign exceeding eight square feet in area appertaining to the lease, hire or sale of a builing or premises; and no commercial advertising sign of any other character shall be permitted in a dwelling district."

Following this, Apartment House Districts and the other Districts named above are described. Area Districts are also regulated and defined, but we deem it unnecessary to quote the ordinance relative thereto. It is sufficient to say that the purpose of the *area* district is to regulate the front, back, and side yards of constructions permitted in the district, as well as the height of buildings, etc.

Section 9 of the ordinance relates to non-conforming uses. The use of any property existing at the time of the passage of the ordinance which does not conform to the regulations described in the previous sections is defined as a non-conforming use. The non-conforming uses are permitted to continue, subject to certain regulations, but such non-conforming use can not be extended nor changed, except to a conforming use.

The zoning ordinance seems to be the usual one which obtains generally throughout the country, and we believe it unnecessary to further state its contents. The ordinance is readily available in full upon application to the City of Dallas.

It appears that business institutions, apartment houses, local retail stores, and maunfacturing establishments are not permitted in a dwelling district with certain exceptions, such as telephone exchanges, water supply features, passenger stations, farms, nurseries, green houses, etc. Gasoline stations, the type of business institution involved in this proceeding, are excluded from dwelling districts, although they may be established in local retail, commercial, and manufacturing districts.

■■ The right to establish zoning districts is well established throughout the United States, and has been approved by the courts of many jurisdictions. The constitutionality of the law and the ordinance before us was before the Court of

Civil Appeals in the case of Scott v. Champion Bldg. Co., 28 S. W. (2d) 178, and Associate Justice Looney in a very elaborate and able opinion sustained the validity of both, and since that opinion in our judgment is not assailable we shall pretermit a discussion of some of the objections here presented. It is urged upon us that under the authority of the Spann Case, 111 Texas, 350, 235 S. W., 513, 19 A. L. R., 1387, the statute and ordinance are necessarily invalid. We do not think so. The ordinance before the Court in the Spann Case was fatally defective for various reasons. That case, however, did not involve a comprehensive zoning plan adopted in accordance with and in compliance with statutory authority, and we do not regard it as an authority against the integrity of the statute and ordinance before us. We quite agree with what Associate Justice Looney said with reference to this matter in the Scott Case cited above. The basic proposition here urged by the plaintiff in error is stated in his argument filed in this Court, as follows:

"The zoning Act of the Legislature of the State and/or the zoning ordinance of the City of Dallas plead as defensive matter are not referable to, but if so, are not an admissible exercise of that power of the Government of Texas known as the Police Power."

The meaning of this proposition is, briefly, that the zoning statutes above named and the ordinance here involved "are, in general scope, unconstitutional and void because in conflict with familiar constitutional provisions of both State and Federal Constitutions, in that they authorize the taking, damaging and destroying of property" without due process, and deny equal protection of the law. With this proposition we can not agree. The insistence that the right of property or the *unrestricted use* of property is not subject to the police power has long since been determined adversely to that contention.

Texas Jurisprudence states the general rule as applied in this State as follows:

"Generally speaking, municipal corporations have the right, under the police power, to safeguard the health, comfort, and general welfare of their citizens by such reasonable regulations as are necessary for that purpose.

"The police power is not an arbitrary one; it has its limitations. Thus it is subject to the limitations imposed by the Constitution upon every power of government, and will not be permitted to invade or impair the fundamental liberties of the citizen. Also it is founded in public necessity and only public

necessity can justify its exercise. *It is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience as consistently as may be with private property rights.* The interests of the public generally, as distinguished from those of a particular class, must require the interference.

"*All property is held subject to the valid exercise of the police power; nor are regulations unconstitutional merely because they operate as a restraint upon private rights or person or proptrey or will result in loss to individuals.* The infliction of such loss is not a deprivation of property without due process of law; the exertion of the police power upon subjects lying within its scope, in proper and lawful manner, is due process of law. Moreover, police regulations do not constitute a taking of property under the right of eminent domain; and compensation is not required to be made for such loss as is occasioned by the proper exercise of the police power. But the police power is subordinate to the right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody. It may be invoked to abridge the right of the citizen to use his private property when such use will endanger public health, safety, comfort or welfare,— and only when this situation arises. Regulations interfering with private property rights are invalid if founded upon purely aesthetic consideration. Again, property rights can not be made subservient to the arbitrary will of a municipality or its officers or agents, nor can the right of a person to use his property in a lawful manner be made to depend upon the unrestrained predeliction of other property owners, whose property rights are not unlawfully invaded." (Italics ours.) 30 Texas Jurisprudence, p. 120, Sec. 58.

The rule as stated is one which generally obtains, and finds sanction in the decisions of the Supreme Court of the United States. In the case of Chicago, B. & Q. Ry. v. Illinois Drainage Comm'rs., 200 U. S., p. 561, that Court, in an opinion by Associate Justice Harlan, as stated in the head notes, declared:

"Uncompensated obedience to a regulation enacted for the public safety under the police power of the State is not taking property without due compensation, and the constitutional prohibition against the taking of private property without compensation is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over

private property which is necessary for the orderly existence of all governments."

Nor did Justice Harlan limit the application of the rule to laws designed to protect public health, morals, or public safety; but included those designed to promote public convenience and general prosperity as well. In the body of the opinion he declared:

"The learned counsel for the railway company seem to think that the adjudications relating to the police power of the State to protect the public health, the public morals and the public safety are not applicable, in principle, to cases where the police power is exerted for the general well-being of the community apart from any question of the public health, the public morals or the public safety. Hence, he presses the thought that the petition in this case does not, in words, suggest that the drainage in question has anything to do with the health of the Drainage District, but only avers that the system of drainage adopted by the Commissioners will reclaim the lands of the District and make them tillable or fit for cultivation. We cannot assent to the view expressed by counsel. We hold that the *police power of a States embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety*. Lake Shore & Mich. South Ry. v. Ohio, 173 U. S., 285, 292; Gilman v. Philadelphia, 3 Wall., 713, 729; Pound v. Turck, 95 U. S., 459, 464; Hannibal & St. J. Railroad Co. v. Husen, 95 U. S., 470." (Italics ours.)

■ Of course every regulation adopted under the police power must be a reasonable one. As stated in Texas Jurisprudence, Vol. 30, p. 123, sec. 59:

"The police power authorizes only such measures as are reasonable; to be valid as an exercise of this power, an ordinance must be reasonable in its operation upon the persons whom it affects, and must not be unduly oppressive—that is, it must appear that the means adopted are reasonably necessary and appropriate for the accomplishment of a legitimate object falling within the domain of the police power."

■ It being established, as we believe, that the police power may be exerted in the interest of the public health, safety, morals, convenience, and general welfare of the inhabitants of a city, it remains to determine whether or not the statutes and ordinance before us constitute a reasonable exercise of that power. To be more specific: In determining the questions before us we are back to the basic issue as to whether or not the

exclusion of business institutions from a residential district is a reasonable exercise of the police power,—that is, whether or not the exclusion of business, etc., from a residential district has such relation to the ordinary objects of the police power, that is to health, safety, morals, and general welfare of the people, as to authorize its exercise.

It is not to be doubted that long before the enactment of zoning legislation in the United States the courts of the country had found ample authority in the dominance of the police power to regulate, govern, and restrict the construction of buildings, and in some instances prohibit their location and construction for certain uses, and to prohibit certain occupations in specified localities.

Speaking with reference to the general powers of municipalities concerning Public Health, Judge Dillon declares:

"Our municipal corporations are usually invested *with express power to preserve the health and safety of the inhabitants.* This is, indeed, one of the chief purposes of local government, and reasonable by-laws in relation thereto have always been sustained in England as within the incidental authority of corporations to ordain. In determining the validity of ordinances adopted to promote the health and comfort of the inhabitants it may be taken as firmly established that the State possesses, and therefore municipal corporations under legislative sanction may exercise, the power to prescribe such regulations as may be reasonably necessary and appropriate for the protection of public health and comfort, and that no person has an absolute right to be at all times and in all circumstances wholly freed from restraint; but persons and property are subject to all reasonable kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State, the public as represented by its constituted authorities taking care always that no regulation, although adopted for those ends, shall violate rights secured by the fundamental law nor interfere with the enjoyment of individual rights beyond the necessities of the case. It is *equally well settled that if a regulation, exacted by competent public authority avowedly for the protection of the public health, has a real, substantial relation to that object, the courts will not strike it down upon grounds merely of public policy or expediency".* (Italics ours.) Dillon on Municipal Corporations, (5th ed), Vol. 2, p. 1022, sec. 677.

Judge Dillon cites various examples of the exercise of prohibitory powers, closely related to the zoning power, which have been sustained by the courts. For example: An ordinance

prohibiting the growing of rice in the City of Savannah was sustained. Green v. City of Savannah, 6 Ga., p. 1. The courts held that the City of New York had the power to prohibit the erection and maintenance of private hospitals. 2 Dillon, supra, sec. 681. Burials may be prohibited within a city. 2 Dillon, supra, sec. 682. Restricting burials to designated places sustained. Austin v. Austin City Cemetery Association, 87 Texas, 330. Slaughter houses may be restricted as to location. 2 Dillon, supra, p. 1048, sec. 691. Livery stables may be confined to designated limits, although not nuisances per se. 2 Dillon, supra, p. 1049, sec. 692. It is within the police power to prohibit the owner of a building from permitting the emission or discharge of smoke or cinders, etc. 2 Dillon, supra, sec. 694, p. 1051. Other instances of the valid exertion of the police power, similar or related to that contained in the zoning ordinance before us, have been sustained. Certain classes of traffic may be prohibited on designated streets. Cicero Lumber Co. v. Town of Cicero, 176 Ill., 9. Acts regulating the height of buildings are valid. 2 Dillon, supra, sec. 696, p. 1062. The validity of a section of the Building Code of the City of Dallas, providing "That whenever any lots are laid off by any plat, showing a frontage for said lots on any street or avenue in the residence section of the city all buildings erected on same shall keep their frontage on said street or avenue so as to conform to the frontage of the lots shown on any such plat", was susutained by this Court as within the police power. Halsell v. Ferguson, 109 Texas, 144, 149.

Apartment or Tenement Houses have always been regarded as peculiarly subject to the police power. 2 Dillon, supra, sec. 698, p. 1069. The reason is that these buildings and their operation are a separate and distinct class from other buildings, having characteristics, as found by experience, which make them frequently radiating points for disease and focal points for immorality and crime. In Matter of Paul, 94 N. Y., 497; N. Y. Health Dept. v. Trinity Church, 145 N. Y., 32. In the last case cited Mr. Justice Peckham said with reference to the evils incident to tenement houses:

"The tenement house in New York is a subject of very great thought to the residents of that city. The numbers of people that live in such houses, their size, their ventilation, their cleanliness, their liability to fires, the exposure of their occupants to contagious diseases, and the consequent spread of the contagion through the city and the country, the tendencies to immorality and crime where there is very close packing of

human beings of the lower order in intelligence and morals, all these are subjects which must arouse the attention of the legislator and which it behooves him to see to in order that such laws are enacted as shall directly tend to the improvement of the health, safety, and morals of the men and women that are to be found in such houses."

The regulation of streets and traffic over them is within the police power of municipalities. 2 Dillon, supra, secs. 712, 714, p. 1083, 1086. The storage of *gun powder* is, of course, subject to the police power. 2 Dillon, sec. 726, p. 1103. Fire limits may be established and the erection of wooden buildings therein prohibited. 2 Dillon, sec. 727, p. 1103.

Summarizing, in part, the application of the police power to buildings and occupations, prior to the advent of zoning, Mr. McQuillin, in his notable work on Municipal Corporations, in part states:

"The doctrine has long been established that the municipality may, under delegated police power, exercise reasonable supervision and control over all kinds of business and property within the corporate limits whenever necessary for the public health, safety, morals, or general welfare. A business may be regulated although it is not a nuisance per se. By virtue of the broad powers generally possessed by cities and towns at present certain industries and occupations may be forbidden in particular sections, parts or areas, and apart from so-called zoning regulations, emanating from express grant of power, specified kinds of business and occupations may be restricted to named localities.

"Things offensive to the sense of smell constitute nuisances at common law, and it has been settled by numerous well-considered judicial decisions that they may be forbidden, under penalty, by ordinance, for example, unwholesome smells arising from the burning of garbage, odors and gas from fat-rendering establishments, or from the manufacture of superphosphate of lime.

"To be valid and constitutional ordinances regulating trades, businesses, industries and manufactories of the several kinds so generally carried on in urban centers, directing their location, and excluding certain of them from specified districts, must emanate from sufficient grant of power and have a reasonable relation to the preservation of the public health, safety, morals and comfort of the inhabitants. Any kind of industry which is a menace, or likely to become such due to its location and surroundings, or the manner in which it is conducted to the con-

servation of any of those things fairly within the scope of the legitimate exercise of the police power, which the government exists to preserve and promote, may be regulated. Where the conditions justify the distinction and classification, familiar examples as to restrictions of location are: Undertaking establishments, which may be restricted within prescribed limits, and forbidden on residential streets; the storage, cleaning and renovating of uncured animal hair and its by-products; cemeteries; tanneries; public laundries and wash houses; lumber yards; brick yards, brick making and brick kilns; livery stables; stone quarries, and stone crushers; junk stores and yards; deposits of powder, oil, combustible and explosives; stockyards; pig pens; operation of soap, glue, coal oil, vitrol and like factories; slaughter houses; dairies and cow stables; carpet-beating establishments; junk shops; second-hand dealers; rag pickers; ice cutting; saloons; dancing schools; ice factories; vegetable and fruit stands; operation of factories; public automobile garages; automobile battery stations in which are kept, sold and repaired automobile storage batteries may be restricted as to location under ample grant of power, but not so under the usual powers granted upon the incorporation of cities or towns; gasoline and oil filling stations; and bill-boards may be prohibited in the language of the Supreme Court 'in residence districts of the city in the interest of the safety, morality, health and decency of the community'." McQuillin on Municipal Corporations (2d ed.), vol. 3, sec. 962.

The foregoing suffice to show that the police power may be exerted to regulate the use, and where appropriate or necessary, prohibit the use, of property for certain purposes in aid of the public health, morals, safety, and general welfare, and that the constitutional limitations form no impediment to its exertion where the enactment is reasonable and bears a fair relationship to the object sought to be attained.

■ The zoning ordinance before us is but an extension of the principles underlying the cases and authorities cited,—made necessary or appropriate and reasonable by modern conditions. Among the objects of the statutes and ordinances here involved is the safety of the inhabitants of the City of Dallas. The City seeks to attain this by preventing concentration of population and congestion in the streets. Before the coming of the automobile, bus, and electric railways, there was, of course, a very practical reason why factories and business enterprises should be within or adjacent to residential districts. This reason no longer exists. Modern transportation facilities have made it

possible to reside a great distance from factory, store, and office, and still reach them with ease. But with these facilities of transportation has arisen a new danger, making appropriate the exertion of the police power in a new direction or over a wider field than before. According to an editorial in a current publication, (Collier's Weekly, June 30), last year 29,900 people were killed and 850,700 were injured in motor accidents; while within the last four years 125,000 have been killed and 4,000,000 injured. The writer shows that of those killed several thousand were killed on city streets,—1,680 of whom were playing children. We know the facts stated as a matter of current history.

■■ To say that a municipality may not be given the power to prohibit the erection of business houses, filling stations, factories, and apartment houses, in residential distrcts, each of which necessarily contributes to the congestion of traffic and its attendant dangers, would be a failure to apply common sense to modern city life. Certainly some business houses could be operated in a residential district without danger to the health of its inhabitants, but no store or commercial enterprise could be maintained without customers who arrive and depart in their motor cars; nor could stores be operated without delivery trucks and vehicles, which necessarily increase the traffic hazards of the community. With reference to gasoline filling stations, such as here involved, we quite agree with Associate Justice Looney when he said:

"Courts judicially know that gasoline and other inflammable petroleum products are explosive and constantly menace the safety of persons and property, wherever stored or kept for sale. While it cannot be correctly said that a gasoline station is a nuisance per se, yet, when erected and maintained at a place prohibited by a reasonable regulatory ordinance, it may be properly considered a nuisance, by reason of its prohibited location, and dealt with accordingly. See City of Wichita Falls v. Continental Oil Co. (Texas Civ. App), 5 S. W. (2d) 561; City of San Antonio v. Robert Thompson (Texas Civ. App.), 23 S. W. (2d) 796; Pierce Oil Corp. v. City of Hope, 127 Ark., 38, 191 S. W., 405, Ann. Cas. 1918E, 143. Affirmed on writ of error by the United States Supreme Court, 248 U. S., 498, 39 S. Ct., 172, 63 L. Ed., 381; Morgan v. Board of Com'rs., 104 N. J. Law, 13, 139 A. 718; State ex rel. v. Stark, 96 W. Va., 176, 122 S. E. 533; Standard Oil Co. v. City of Danville, 199 Ill., 50, 64 N. E., 1110; In re McIntosh v. Johnson,

211 N. Y., 265, 105 N. E., 414, L. R. A. 1916D, 603." Scott et al. v. Champion Bldg. Co. et al., 28 S. W. (2d) 178, 180.

■ Not only is a filling station a source of danger because the storage place of large quantities of explosives, but a filling station can not be operated without customers, and there can not be customers without increased traffic—the passing of cars from and into the streets. It is too plain to require argument that the location of filling stations may be controlled by the municipal authorities under a proper statute.

Nor do we believe that there can be any substanial difference of opinion that the location of factories in a residential district would increase the traffic hazards of the district.

We think it quite apparent, too, that to permit the erection of filling stations, factories, business and apartment houses generally in a residential district, would necessarily increase the fire and police hazards of the community.

Finally, we do not regard as debatable the conclusion that the exclusion of Apartment Houses, with the evils the Courts have declared they sometimes engender, and of Factories and Business Houses, with the noise and confusion which their operation necessitates, is a measure which contributes to the health of the community. No man who is able to do otherwise lives in a factory or commercial district, because experience has shown that a home where the noise and confusion of business do not obtain is of direct benefit to his family's health and peace of mind. In making these statements we are dealing with actualities just as well known to the Legislature, City Councils, and Courts, as to the average man.

■ That the establishment of Dwelling or Residential Districts from which Apartment Houses, etc., are excluded is conducive to the general welfare is demonstrated in the opinion of the Supreme Court of California in the case of Miller v. Board of Public Works of Los Angeles, 195 Calif., 477, 234 Pac., 381, 387, wherein that Court declared:

"The establishment of single family residence districts offers inducements, not only to the wealthy, but to those of moderate means to own their own homes. With ownership comes stability, the welding together of family ties, and better attention to the rearing of children. With ownership comes increased interest in the promotion of public agencies, such as church and school, which have for their purpose a desired development of the moral and mental make-up of the citizenry of the country. With ownership of one's home comes recognition of the individual's responsibility for his share in the safeguard-

ing of the welfare of the community and increased pride in personal achievement which must come from personal participation in projects looking toward community betterment.

*　*　*　*　*

"In other words, the apartment house, tenement, flat, and like structures tend to the exclusion of homes."

There are other reasons for saying that the exclusion of business houses, factories, etc., from a residential district is within the police power, which may be found stated in the cases below, but the above suffice.

On the whole, we may say as did the Supreme Court of Illinois in the case of the City of Aurora v. Burns, 319 Ill., 84, 149 N. E., 784, 788:

"Uses of private property detrimental to the community's welfare may be regulated or even prohibited. (Citing cases.) The harmless may sometimes be brought within the regulation or prohibition in order to abate or destroy the harmful. The segregation of industries, commercial pursuits, and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety, and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population; secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires, and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted."

■ Our conclusion that the zoning statute and the ordinance before us are valid is supported by the decisions of the Courts in many jurisdictions. United States Cases: Euclid v. Ambler Realty Co., 275 U. S., 365, 47 Sup. Ct., 114, 71 L. Ed., 303; State of Washington v. Robuge, 278 U. S., 116, 49 Sup. Ct., 50, 72 L. Ed., 210; Zahn v. Board of Public Works., 274 U. S., 325; Gorieb v. Fox, 274 U. S., 603; Nectow v. Cambridge, 277 U. S., 183; Am. Wood Products Co. v. City of Minneapolis, 35 Fed. (2d) 660, 21 Fed. (2d) 440; Delano v. City of Tulsa, 26 Fed. (2d) 640; Larrabee v. Bell, 10 Fed. (2d) 986. State Cases: Arkansas—Herring v Stannus, 169 Ark., 244, 275 S. W., 321; Little Rock v. Pfeifer, 169 Ark., 1027, 277 S. W., 883; California—Miller v. Board of Public Works, 195 Calif., 477, 234 Pac., 381; Zahn v. Board of Public Works, 195 Calif., 497, 234 Pac., 388; Fordcade v. City of San Francisco, 196 Calif, 655, 238

Pac., 934; Dyer v. City of Berkeley, 200 Calif., 505, 253 Pac., 932; Colorado—Holby v. Board of Adjustment, 81 Col., 344, 255 Pac., 443, Connecticut—State v. Hillman, 110 Conn., 92, 147 Atl., 294; Georgia—Howden v. Mayor, 172 Ga., 833, 159 S. E., 401; Illinois—City of Aurora v. Burns, 319 Ill., 84, 149 N. E., 784; Deynzer v. City of Evanston, 319 Ill., 226, 149 N. E., 790; Indiana—Great Outdoor Advertising Co. v. City of India-napolis, 202 Ind., 85, 172 N. E., 309; Iowa—City of Des moines v. Manhattan Oil Co., 193 Iowa, 1096, 188 N. W., 921; Anderson v. Jester, 206 Ia., 452, 221 N. W., 354; Kansas—Ware v. Wichita, 113 Kan., 153, 214 Pac., 99; Kentucky—Fowler v. Obier, 224 Ky., 742; 7 S. W. (2d) 219; Louisiana—State v. New Orleans, 154 La., 271, 97 So., 440; Maine—Opinion of Justice, 124 Me., 501, 128 Atl., 181; Maryland—R. B. Construc-tion Co. v. Jackson, 152 Md. 671, 137 Atl., 278; Massachusetts—Inspector of Buildings v. Stoklosa, 250 Mass., 52, 145 N. E., 262; Opinion of Justice, 234 Mass., 597, 127 N. E., 525; Michigan—Dawley v. Collingwood, 242 Mich., 247, 218 N. W., 766; Minne-sota—State v. Houghton, 171 Minn., 231, 213 N. W., 907, 164 Minn., 146, 204 N. W., 569; Mississippi—Jackson v. McPherson, 162 Miss., 164, 138 So., 604; Missouri—State v. Christopher, 317 Mo., 1179, 298 S. W., 720; Nebraska—Pettis v. Alpha, etc., 115 Neb., 525, 213 N. W., 835; New Hampshire—Sundeen v. Rogers, 83 N. H., 253, 141 Atl., 142; New York—Lincoln Trust Co. v. Building Corp., 229 N. Y. 313, 128 N. E., 209; Wulfsohn v. Burden, 241 N. Y., 288, 150 N. E. 120, 43 A. L. R., 651; New Jersey—Jannarone v. Board of Adjustment, 153 Atl., 256; N. Carolina—State v. Roberson, 198 N. C., 70, 150 S. E., 674; N. Dakota—Bismark v. Hughes, 53 N. D., 838, 208 N. W., 711; Ohio—City of Youngstown v. Kahn Bros. Bldg. Co., 112 O. St., 654, 148 N. E., 842; Pritz v. Messer, 112 O. St., 628, 149 N. E., 30; Oklahoma—McCurley v. El Reno, 138 Okla., 92, 280 Pac., 467; Baxley v. City of Frederick, 133 Okla., 84, 271 Pac., 257; Oregon—Kroner v. Portland, 116 Or., 141, 240 Pac., 536; Pennsylvania—Ward's Appeal, 289 Pa. 458, 137 Atl., 630; Peti-tion of Liggett, 291 Pa., 109, 139 Atl., 619; Rhode Island—City of Providence v. Stephens, 47 R. I., 387, 133 Atl., 614; S. Dakota—City of Brookings v. Martinson, 246 N. W., 916; Tennessee—Spencer-Sturla Co. v. City of Memphis, 155 Tenn., 70, 290 S. W., 608; Utah—Salt Lake City v. Western Foundry Co., 55 Utah, 447, 187 Pac., 828; Virginia—Gorieb v. Fox, 145 Va., 554, 134 S. E., 914; Wisconsin—Bouchard v. Zetley, 196 Wis., 635, 220 N. W., 209; Holzbauer v. Rittler, 184 Wis., 35, 198 N. W., 852.

The question was first decided by the Supreme Court of the

United States in the case of Village of Euclid v. Ambler Realty Company, 272 U. S., 365, 47 Sup. St., 114, 71 L. Ed., 303, 54 A. L. R., 1016. The ordinance there involved was quite similar in its purpose and effect to the one in the instant case. The Supreme Court of the United States in an opinion by Justice Sutherland sustained its validity, holding that the exclusion from residential districts of business and trade of every sort, including hotels and apartment houses, could not be said to be so clearly arbitrary and unreasonable and to have no such substantial relation to the public health, safety, morals, and general welfare, as not to be within the police power. In sustaining the ordinance Justice Sutherland referred to the fact that the Constitution of the United States and that of the State of Ohio, where the suit originated, were quite similar in prohibiting the taking of property without due process. In part he said:

"The serious question in the case arises over the provisions of the ordinance excluding from residential districts, apartment houses, business houses, retail stores and shops, and other like establishments. This question involves the validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which business and trade of every sort, including hotels and apartment houses, are excluded. Upon that question this Court has not thus far spoken. The decisions of the state courts are numerous and conflicting; but those which broadly sustain the power greatly outnumber those which deny altogether or narrowly limit it; and it is very apparent that there is a constantly increasing tendency in the direction of the broader view."

\* \* \* \* \*

"The decisions enumerated in the first group cited above agree that the exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are—promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and prevention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordinances, aiding the health and safety of the community by excluding, from residential areas the confusion and danger of fire, contagion and disorder which in greater or less degree attach to the location of stores, shops and factories. Another ground is that the construction and repair of streets may be rendered easier and less expensive by confining the

greater part of the heavy traffic to the streets where business is carried on.

"The Supreme Court of Illinois, in *City of Aurora v. Burns, supra,* (319 Ill.) pp. 93-95, in sustaining a comprehensive building zone ordinance dividing the city into eight districts, including exclusive residential districts for one and two-family dwellings, churches, educational institutions and schools, said:

" 'The constantly increasing density of our urban populations, the multiplying forms of industry and the growing complexity of our civilization make it necessary for the State, either directly or through some public agency by its sanction, to limit individual activities to a greater extent than formerly. With the growth and development of the State the police power necessarily develops, within reasonable bounds, to meet the changing conditions * * *

" '* * * The harmless may sometimes be brought within the regulation or prohibition in order to abate or destroy the harmful. The segregation of industries commercial pursuits and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted. * * *

" '* * * The exclusion of places of business from residential districts is not a declaration that such places are nuisances or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is alloted to different uses in order to prevent, or at least to reduce, the congestion, disorder and dangers which often inhere in unregulated municipal development.'

"The Supreme Court of Louisiana, in *State v. City of New Orleans, supra,* (154 La.) pp. 282-283, said:

" 'In the first place, the exclusion of business establishments from residence districts might enable the municipal government to give better police protection. Patrolmen's beats are larger, and therefore fewer, in residence neighborhoods than in business neighborhoods. A place of business in a residence neighborhood furnishes an excuse for any criminal to go into the

neighborhood, where, otherwise, a stranger would be under the ban of suspicion. Besides, open shops invite loiterers and idlers to congregate; and the places of such congregations need police protection. In the second place, the zoning of a city into residence districts and commercial districts is a matter of economy in street paving. Heavy trucks, hauling freight to and from places of business in residence districts, require the city to maintain the same costly pavement in such districts that is required for business districts; whereas, in the residence districts, where business establishments are excluded, a cheaper pavement serves the purpose. * * *

" 'Aside from considerations of economic administration, in the matter of police and fire protection, street paving, etc., any business establishment is likely to be a genuine nuisance in a neighborhood of residences. Places of business are noisy; they are apt to be disturbing at night; some of them are malodorous; some are unsightly; some are apt to breed rats, mice, roaches, flies, ants, etc. * * *

" 'If the municipal council deemed any of the reasons which have been suggested, or any other substantial reason, a sufficient reason for adopting the ordinance in question, it is not the province of the courts to take issue with the council. We have nothing to do with the question of the wisdom or good policy of municipal ordinances. If they are not satisfying to a majority of the citizens, their recourse is to the ballot—not the courts.'

"The matter of zoning has received much attention at the hands of commissions and experts, and the results of their investigations have been set forth in comprehensive reports. These reports, which bear every evidence of painstaking consideration, concur in the view that the segregation of residential, business, and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; that it will increase the safety and security of home life; greatly tend to prevent street accidents, especially to children, by reducing the traffic and resulting confusion in residential sections; dcrease noise and other conditions which produce or intensify nervous disorders; preserve a more favorable environment in which to rear children, etc. With particular reference to apartment houses, it is pointed out that the development of detached house sections is greatly retarded by the coming of apartment houses, which has sometimes resulted in destroying the entire section for private house purposes; that in such sections very often the apartment house is a mere parasite, constructed in order to take advantage

of the open spaces and attractive surroundings created by the residential character of the district. Moreover, the coming of one apartment house is followed by others, interfering by their height and bulk with the free circulation of air and monopolizing the rays of the sun which otherwise would fall upon the smaller homes, and bringing, as their necessary accomplishments, the disturbing noises, incident to increased traffic and business, and the occupation, by means of moving and parked automobiles, of larger portions of the streets, thus detracting from their safety and depriving children of the privilege of quiet and open spaces for play, enjoyed by those in more favored localities,—until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed. Under these circumstances, apartment houses, which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances.

"If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of those restrictions which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. *Cusack Co. v. City of Chicago, supra,* (242 U. S.) pp. 530-531; *Jacobson v. Massachusetts,* 197 U. S., 11, 30-31.''

Similar or related questions were again before the Supreme Court of the United States in several cases which have been cited above. The same question on ordinances similar in purpose and effect, as here involved, have come before and been sustained by the courts of many states, as shown by the authorities above cited. In the face of the authority conferred by the Legislature of this State to create such districts, as are here involved, and in the face of this great array of judicial authority that zoning regulations of the character before us are within the police power, and that the prohibition of business enterprises within a residential district is not the taking of property without due process, it would be a plain presumption on our part to say that the prohibition of business enterprises, such as that of the defendant in error, in residential districts was so unrelated to the health, safety, morals, and general welfare of the people that the validity of the statute and the zoning ordinance could not be sustained. The rule is that in order to hold a statute void we must be able

to say that it is clearly unconstitutional and to hold an ordinance invalid it must be clearly and plainly unreasonable.

In passing upon the validity of an act or an ordinance affecting the public, such as those before us, our duty is one of serious consideration, for, as said by Texas Jurisprudence (Vol. 9, p. 466, sec. 49):

"One of the most delicate duties to be performed by the Judicial branch of the government is that of declaring an act of the legislative department to be unconstitutional and invalid. The power of the courts in this respect is one that will be exercised with great caution, especially where the matters in controversy pertain to *governmental policies, the public health* and public utilities. The court must necessarily cover the same ground as that which has already been covered by the legislative department, and it must indirectly overrule the decision of that co-ordinate department." (Italics ours.)

Or as stated by the Supreme Court of Illinois in Daniels v. Hilgard, 77 Ill., 640:

"The question whether certain requirements are a part of a system of police regulation adapted to aid in the protection of life and health, is properly one of legislative determination, and a court should not lightly interfere with such determination, unless the legislature has manifestly transcended its province."

What we have determined here is that the zoning statutes are valid and that the ordinance before us in its general scope and dominant features, so far as its provisions are here involved, is a valid exercise of authority. As to the numerous other provisions of the ordinance, concerning which there might arise some constitutional question due to circumstances peculiar to other property or the regulation invoked, we express no opinion, but leave the other provisions of the ordinance as they may touch other property to be dealt with as cases arise directly concerning them.

As said by the Supreme Court of the United States in the Ambler Case,

"And this is in accordance with the traditional policy of this Court. In the realm of constitutional law, especially, this Court has perceived the embarrassment which is likely to result from an attempt to formulate rules or decide questions beyond the necessities of the immediate issue. It has preferred to follow the method of a gradual approach to the general by a systematically guarded application and extension of constitutional principles to particular cases as they arise, rather than by out of hand attempts to establish general rules to which future cases must be fitted. This process applies with peculiar

force to the solution of questions arising under the due process clause of the Constitution as applied to the exercise of the flexible powers of police, with which we are here concerned."

There is certainly nothing peculiar to the property of the plaintiff in error which would make the ordinance invoked inapplicable or invalid as to it. The property is a corner lot in a fine residential section of the City of Dallas, on a level with the remainder of the lots, and as is apparent from the photographs before us plainly suitable for residential purposes; and to refuse the plaintiff in error the right to use this property for any purpose except those specified in the zoning ordinance applicable does not deny him any constitutional right.

We pretermit the discussion of other questions presented because these have been correctly disposed of by the Court of Civil Appeals in this case, and in the case of Scott v. Champion Building Co., 28 S. W. (2d) 178.

The judgment of the Court of Civil Appeals is affirmed.