Ben **CARTER**, also known as Ben Katz, et al., Appellants,

v.

Quincy **LEE** et al., Appellees.

No. 7510.

Court of Civil Appeals of Texas, Beaumont.

Nov. 21, 1973.

Rehearing Denied Dec. 27, 1973.

926

Oliver & Oliver, James R. Warncke, San Antonio, for appellants.

Howard C. Walker, Jackson C. Hubbard, Foster, Lewis, Langley, Gardner & Banack, San Antonio, for appellees.

STEPHENSON, Justice.

This is an action for damages to land caused by the diversion by defendants, Quincy Lee and The Quincy Lee Company, of the natural flow of surface water onto plaintiffs' land. The City of San Antonio was also named as a defendant. Trial was by jury and judgment was rendered for defendants upon the verdict. The parties will be referred to here as they were in the trial court.

The record shows the plaintiffs are the owners of some 96 acres of land located in San Antonio. The defendants Lee own the land immediately east of plaintiffs' property and are and have been developing such land into subdivisions known as Mary Mont. It was the development of Mary Mont Nine, by placing street, curbing and open drains to carry surface water, that gave rise to this controversy. Plaintiffs alleged that defendants Lee diverted the natural flow of such surface water onto plaintiffs' land causing the damage complained of in violation of Vernon's Ann Civ.St., Art. 7589a.

The jury found: that defendant Quincy Lee Company, in constructing the streets, drains, and improvements, diverted the natural flow of the surface water as to damage "the property in question belonging to the Plaintiffs"; that such damage was permanent; and that the action of the city in permitting such diversion was intentional and also negligence and a proximate cause of the damages in question. However, the jury failed to find the action of the city in permitting such diversion to be unreasonable. The jury also found the reasonable cash market value "of the property in question belonging to the Plaintiffs," immediately prior to the diversion and immediately after the diversion, was $5,000.

This cause of action arose before the enactment of the Texas Water Code which became effective August 30, 1971. Art. 7589a, supra, was in effect at the time of the diversion complained of, and read in part as follows:

"It shall hereafter be unlawful for any person, firm or private corporation to divert the natural flow of the surface waters in this State . . . in such manner as to damage the property of another, by the overflow of such water so diverted . . . , and that in all such cases the injured party shall have remedies, both at law and in equity, including damages occasioned thereby. . . ."

This court recently passed upon some of the questions before us here, in a well-written opinion by Justice Keith, in Langford v. Kraft, 498 S.W.2d 42, 46 (Tex. Civ.App., Beaumont, 1973, writ pending). A portion of that opinion reads as follows:

"Not all of Developers' lands were higher than that of plaintiff; and, as to the land of plaintiff which was lower than that of Developers, it 'must receive the surface waters naturally flowing thereon from a higher estate, yet it is not required to receive these waters except in their natural condition, untouched by the hands of man.' Bunch v. Thomas, 121 Tex. 225, 49 S.W.2d 421, 423 (1932). Plaintiff's '[l]and is subject to no servitude to receive upon it water, the natural flow of which has been diverted to it.' Higgins v. Spear, 118 Tex. 310, 15 S.W.2d 1010, 1011 (1929). The priprietor of higher land 'is entitled to have surface water flow to the lower land, so long as the water follows its usual course and runs in its natural quantities.' Samples v. Buckman, 246 S.W.2d 283,

285 (Tex.Civ.App., Amarillo, 1952, error ref.)."

Plaintiffs have points of error challenging the findings of the jury that the value "of the property in question" was $5,000 both before and after the diversion. We pass upon the no evidence points by considering only the evidence favorable to such findings, and the insufficiency and great weight points by considering the entire record. Plaintiffs also have points of error that the answers of the jury to the damage issues are in irreconcilable conflict with the jury findings that defendants had damaged plaintiffs' land permanently.

All of the testimony in this case shows that defendants Lee diverted the flow of the surface water so that more water drained on plaintiffs' land than would have naturally. Plaintiffs' witness, Harvey Livesay, testified that an additional 41 acres of defendants Lees' land was diverted onto plaintiffs' land. Defendants Lee's witness, Henry Bain, testified that 20 acres was diverted into plaintiffs' land. Plaintiffs' witness, Joe Kurz, testified the diverted acreage was a little better than 25 acres.

Plaintiffs used the following approach in proving their damages: that 19 acres out of the southeast corner of their 95.82 acre tract was best suited for high density, high-rise, multi-family housing and commercial purposes. That because of the diversion of the water 57,000 cubic yards of fill at a cost of $75,000 would be needed to prepare the land for those purposes. That concrete lined drainage channels would be needed because of the diverted water at a total cost of $42,975. That every time it rains sufficiently to put water in the gutters in Mary Mont Nine, water will be diverted onto plaintiffs' land. That water will be standing on plaintiffs' land because of the diversion, perhaps a dozen times a year from six to eight hours. That the 19 acres out of the southeast corner has a value of $6,000 per acre and its highest and best use would be for high-density, medium

high-rise apartments. That the cost of taking care of the diverted water would have to be subtracted from the total value.

Defendants' witness, Henry Bain, testified that only one-half acre of plaintiffs' nineteen acres would be flooded because of the diverted water. Defendants' witness, Albert Love, Jr., testified: that 49.25 acres of plaintiffs' land was high land and 46.6 acres was below building lines. That the fair market value was $8,850 per acre ($5,000 for the low land and $12,500 for the high land) for a total value of $848,000. That the maximum damage to plaintiffs' land because of water diversion was $2,500.

The big problem in this case lies in attempting to determine just what the trial court had in mind in its submission of the damage issues to the jury. The term used "the property in question belonging to the plaintiffs" is so indefinite that it is impossible to be sure of its meaning. The plaintiffs' petition showed that they were the owners of approximately 96 acres of land, and that such land had been damaged by the diversion of water upon it. They alleged that their "property" had been damaged greater in excess of $500 and prayed for actual and punitive damages. Plaintiffs then proceeded to show how much it would cost to take care of the water diverted upon them by both putting in fill dirt and providing concrete lined drainage channels so that 19 acres could be used for the purposes outlined above. Plaintiffs then offered evidence to show the 19 acres had a value of $6,000 per acre for a total value of $114,000 less the cost of taking care of the diverted water. Defendants then offered evidence to show that only one-half acre of plaintiffs' land would be flooded because of the diverted water. Defendants also offered evidence to show that plaintiffs' land had 49.255 acres of high land valued at $12,500 per acre, or $615,000 and 46.6 acres of low land valued at $5,000 per acre, or $233,000 for a total value of $848,000. That defendants' wit-

ness also testified the maximum damage to plaintiffs' land was $2,500.

■ We have come to the conclusion that because of the term used in the damage issue in describing the land inquired about, that this verdict is ambiguous, and it is impossible to be certain just what the jury intended to do. We are aware that we should try to interpret an ambiguous verdict so as to uphold the judgment of the trial court. First Federal Savings & Loan Ass'n of Dallas v. Sharp, 359 S.W.2d 902 (Tex.1962). Also, that the record should be examined in an effort to ascertain the jury's intent. This we have done, and we cannot arrive at a conclusion with the certainty required of us. As it was said in Moore v. Moore, 67 Tex. 293, 3 S.W. 284 (1887).

"As to the true construction of such a verdict, neither the lower court nor this court [Appellate] is permitted to speculate. The verdict must find all the issues made by the pleadings in language which does not admit of mistake. It should be the end and not the continuation of the controversy."

Also, in Northern Texas Traction Co. v. Armour & Co., 116 Tex. 176, 288 S.W. 145 (1926):

"We regard the verdict as being ambiguous to an extent preclusive of that certainty which ought to be a part of administration of the law."

See also, Wanda Petroleum Company v. Reeves, 385 S.W.2d 688 (Tex.Civ.App., Waco, 1964, error ref. n. r. e.), and Bittick v. Ward, 448 S.W.2d 174 (Tex.Civ.App., Beaumont, 1969, error ref. n. r. e.).

■ We have also come to the conclusion, as a separate and distinct ground upon which this reversal is based, that the findings by the jury that the value of "the property in question belonging to the plaintiffs." (whatever that term may have meant) was $5,000 both before and after

the diversion of the water, are contrary to the great weight and preponderance of the evidence and manifestly unjust.

We now turn to that portion of the appeal pertaining to the judgment rendered for the City of San Antonio. As stated above, the jury found that the action of the city in permitting the diversion was intentional; that it was negligence and a proximate cause of the damage in question. All of the evidence shows the plaintiffs protested to the defendants Lee and to the city that all defendants were aware that some of the water from Mary Mont Nine would be diverted onto plaintiffs' land which would not have normally flowed upon it. In fact, the foregoing issues were not attacked by the city. The city defends this appeal on the grounds that the jury found no damage and failed to find that the city's action was unreasonable.

The city cites City of Houston v. Renault, Inc., 431 S.W.2d 322, 325 (Tex. 1968), to support its position that the latter portion of its defense is good. This statement is made in that case:

"Where the invasion is intentional, liability depends upon whether the invasion was unreasonable."

In that case plaintiffs alleged a cause of action against the City of Houston on three theories:

(1) That automobiles on their property had been damaged for public use within the meaning of Art. 1, § 17, Constitution of Texas, Vernon's Ann.St. (Plaintiffs in our case have this allegation.);

(2) Absolute liability for impounding water in violation of V.A.C.S., Art. 7589a, (Plaintiffs alleged diversion of water under that statute.); and

(3) Negligence (Plaintiffs alleged this.).

The jury in the *Renault* case absolved City of Houston of negligence. The Su-

preme Court in the *Renault* case held that V.A.C.S., Art. 7589a, does not apply to a municipal corporation. Then the Supreme Court also held that the invasion was unintentional and that the culvert complained about had been installed before the city annexed the area, and the city had just continued to maintain it as it was. It is apparent that an entirely different situation existed in the *Renault* case, than in the case before us.

■ The law in this state has been settled long ago that a municipality has the exclusive right to control the drainage of surface water within its city limits, but, in exercising that right, it is incumbent upon the city to use ordinary care to avoid injuring the property of its citizens. Providing drainage is not the type of governmental function in which a municipality is exempt from liability. See City of Wichita Falls v. Mauldin, 39 S.W.2d 859 (Tex. Comm.App.1931, judgment adopted).

■ In *Renault,* supra, the Supreme Court adopted Restatement of Torts, § 833, and comment thereunder. Sec. 833 refers to § 826, which reads as follows:

"An intentional invasion of another's interest in the use and enjoyment of land is unreasonable under the rule stated in § 822, unless the utility of the actor's conduct outweighs the gravity of the harm."

Consequently, in order for plaintiffs to prevail against the city, they labored under the burden of proving that city's acts in approving the plat dedicating the streets in the subdivision, resulting in the diversion of the water upon them, was "intentional and unreasonable."

See also § 826, Comment a which reads as follows:

"Many invasions, however, can be justified as reasonable although the actor knows that they are resulting or are substantially certain to result from his conduct. Fundamentally, the unreasona-

bleness of intentional invasions is a problem of relative values to be determined by the trier of fact in each case in the light of all the circumstances of that case (see § 822, Comment j)."

See also § 822, Comment j which reads in part as follows:

"Not every substantial non-trespassory invasion of a person's interest in the use and enjoyment of land is actionable, even where such person is the owner of the land in fee simple absolute and another's conduct is the sole and direct cause of the invasion. Life in organized society, and especially in populous communities, involves an unavoidable clash of individual interests. Practically all human activities, unless carried on in a wilderness, interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms . . . . The very existence of organized society depends upon the principle of 'give and take, live and let live,' and therefore the law of torts does not attempt to impose liability or shift the loss in every case where one person's conduct has some detrimental effect on another. *Liability is imposed only in those cases where the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation.*" (emphasis supplied)

Unquestionably, the conduct was intentional, and we are told that in the determination of the question as to whether the conduct was "unreasonable," that we should consider "Gravity of Harm" as set forth in § 827, and "Utility of Conduct" in § 828. Those two sections read as follows:

"In determining the gravity of the harm from an intentional invasion of another's interest in the use and enjoyment of land, the following factors are to be considered:

(a) the extent of the harm involved;

(b) the character of the harm involved;

(c) the social value which the law attaches to the type of use or enjoyment invaded;

(d) the suitability of the particular use or enjoyment invaded to the character of the locality;

(e) the burden on the person harmed of avoiding the harm.

\*     \*     \*     \*     \*     \*

"In determining the utility of conduct which causes an intentional invasion of another's interest in the use and enjoyment of land, the following factors are important:

(a) social value which the law attaches to the primary purpose of the conduct;

(b) suitability of the conduct to the character of the locality;

(c) impracticability of preventing or avoiding the invasion."

We have considered all of the evidence in the case before us as to the utility of the city's conduct and the gravity of the harm to plaintiffs' land, and we hold that the failure of the jury to find—that the action of the city in permitting the diversion was unreasonable—is contrary to the great weight and preponderance of the evidence and manifestly unjust. For this reason, and the reasons stated above concerning the damages, the cause of action as to all defendants is reversed and remanded.

No definition of "unreasonable" was given in connection with the issues. Upon the new trial, it will be incumbent upon the trial court to submit such explanatory instructions and definitions as will enable the jury to determine the question of unreasonableness under the authorities herein discussed.

Reversed and remanded.

KEITH, Justice (concurring and dissenting on rehearing).

I concur in the reversal of the trial court's judgment because of the holding of the majority "that the findings by the jury that the value of 'the property in question belonging to the plaintiffs' (whatever that term may have meant) was $5,000 both before and after the diversion of the water, are contrary to the great weight and preponderance of the evidence and manifestly unjust." (p. 929)

I now withdraw my concurrence from that part of the opinion finding that the language of the damage issues rendered the jury's verdict too ambiguous to support the judgment for some of the reasons outlined by the City of San Antonio in its first assignment in its motion for rehearing, viz: These were plaintiffs' issues and plaintiffs neither objected to such issues nor requested other issues in different form; plaintiffs had no point on appeal complaining of ambiguity in the verdict or of the form of such issues; and, such a holding, in effect, places the burden upon *defendants* to see that issues relied upon by *plaintiffs* are sufficient to support a recovery.

Plaintiffs made no objections to the charge; consequently, all objections thereto are deemed waived under Rule 272. An independent ground of recovery or defense not conclusively established by the evidence is waived if no issue thereon is given or requested. Glens Falls Insurance Co. v. Peters, 386 S.W.2d 529, 531 (Tex.1965). For obvious reasons, plaintiffs do not contend that the amount of the damages was established conclusively. No other issues were given or requested by the plaintiffs.

Furthermore, this being a trial to a jury, plaintiffs were required to file a motion for new trial under Rule 324, and were required to specify each ground on which it is founded. Rule 320. Furthermore, under Rule 374, any ground of error not distinctly set forth in the motion for new trial is

considered as having been waived. See generally, Wagner v. Foster, 161 Tex. 333, 341 S.W.2d 887 (1960).

However, as I read the opinion, I do not find that reversal was ordered because of the ambiguity in the charge or verdict. The reversal as to Lee rests upon a solid and independent basis—the findings on the damage issues are contrary to the great weight and preponderance of the evidence. However, for the record, I dissociate myself from the part of the opinion which orders a reversal because of such claimed ambiguity; yet, I concur in the reversal of the judgment as to appellee Lee upon the single ground stated in this paragraph.

I dissent from the order overruling the motion for rehearing filed by City of San Antonio; and, particularly, I would sustain the fourth assignment therein:

"The Court erred as a matter of law in holding that the City incurred liability based solely on the City's acts in approving a subdivision plat, which acts were in furtherance of a legitimate, legislative, governmental and police function specifically provided for by state statute."

San Antonio is, of course, a Home Rule City with full rights of local self-government and free to exercise any power not denied it by the constitution or the general statutes. Constitution of Texas, Art. XI, § 5; Art. 1165, V.A.C.S.; 39 Tex.Jr.2d, Municipal Corporations § 312, p. 642, et seq. (1962).

While the legislature has the primary and plenary power to regulate public roads and streets, it may delegate that power to counties or municipalities. State v. City of Austin, 160 Tex. 348, 331 S.W.2d 737, 741 (1960). Municipal planning is designed to preserve the public health and welfare by promoting an harmonious and systematic municipal growth in accordance with the needs of the whole community and is an

exercise of the police power. 62 C.J.S. Municipal Corporations § 83, p. 198 (1949).

In addition to the broad powers conferred by Art. 1175, § 34, V.A.C.S., the legislature has adopted Art. 974a, V.A.C.S., delegating to municipalities the police power to control the platting of subdivisions. Section 4 of the last mentioned statute gives broad power to the municipalities to approve or disapprove such plats "to promote the health, safety, morals or general welfare of the community, and the safe, orderly and healthful development of said community."

Indeed, long before the adoption of Art. 974a, our Supreme Court had upheld the charter and ordinance of Dallas requiring the owner in property within the city limits to conform to abutting streets and alleys as being within the police power. Halsell v. Ferguson, 109 Tex. 144, 202 S.W. 317, 321 (1918). The Court disposed of the right to compensation in this manner:

"Coming within the police power, appellants have to submit to these regulations, *without regard to compensation.*" (Id., emphasis supplied)

This is broad legislative delegation of the police power and its exercise "rests largely in the discretion of its governing body." Kimbrough v. Walling, 371 S.W.2d 691, 693 (Tex.1963). In Davis v. City of Taylor, 123 Tex. 39, 67 S.W.2d 1033, 1034 (1934), the Court said:

"It is equally well settled that, if a power is granted to a city, the exercise thereof is within the discretion of the city, and partakes of a legislative nature. A court will not regulate the exercise of a power expressly granted, unless it is exercised in such a way as to be clearly abusive of the power and an evasion thereof."

In the famous case of Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475, 478–479 (1934), zoning under delegated police power was upheld notwithstanding its ex-

ercise by the City lessened the value of complainant's property. Quoting from a text, Chief Justice Cureton said:

" 'All property is held subject to the valid exercise of the police power; nor are regulations unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals. The infliction of such loss is not a deprivation of property without due process of law; the exertion of the police power upon subjects lying within its scope, in a proper and lawful manner, is due process of law. Moreover, police regulations do not constitute a taking of property under the right of eminent domain; and compensation is not required to be made for such loss as is occasioned by the proper exercise of the police power.' " (emphasis in text omitted)

There is no attack upon the constitutionality of Art. 974a and I have cited the authorities holding that the statute is a valid exercise of delegated police power of the State. Under these circumstances, the constitution does not require that compensation be paid for loss occasioned by the exercise of the police power. State v. Spartan's Industries, Inc., 447 S.W.2d 407, 413 (Tex.1969); State v. Richards, 157 Tex. 166, 301 S.W.2d 597, 600 (1957).

In approving the plat of the subdivision in question, City was exercising delegated police power and any damages which resulted therefrom are not recoverable under the doctrine of damnum absque injuria—a loss without an injury. St. Louis, S. F. & T. Ry. Co. v. Shaw, 99 Tex. 559, 92 S.W. 30 (1906). Any damage sustained by the plaintiffs was not consequent upon the violation of any right recognized by law. Lea County Electric Cooperative, Inc. v. City of Plains, 373 S.W.2d 90, 93 (Tex.Civ. App., Amarillo, 1963, error ref. n. r. e.).

I would affirm the judgment of the trial court as to City of San Antonio.