**CITY OF DALLAS et al. v. LIVELY et al.**

No. 13172.

Court of Civil Appeals of Texas. Dallas.

Jan. 16, 1942.

Rehearing Denied May 1, 1942.

H. P. Kucera, City Atty., and A. J. Thuss, R. L. Dillard, Jr., Jon H. Shurette, and Charles E. Long, Jr., Asst. City Attys., all of Dallas, for appellants.

Lively, Dougherty & Alexander, R. D. Hardy, and Paul S. McCarroll, all of Dallas, for appellees.

Percy C. Fewell, of Dallas, amicus curiae.

YOUNG, Justice.

Appellees in this suit urge invalidity of the Dallas zoning ordinance in so far as it applies to their property, in that, the zoning classification of such lot was arbitrary, unreasonable and confiscatory. The jury findings, in substance, were: (1) The reasonable market value of the property in question, if limited to the uses for which it is now zoned (residential district), was $500; (2) reasonable market value thereof, if permitted to be used for purposes of a gasoline filling station (local retail district), was $12,500; (3) that it was not necessary to the peace, health, safety or general welfare of the public to prohibit the use of appellees' property for purposes of a gasoline filling station; (4) that by reason of its shape, size and location, the lot was not suitable for the purpose for which it is now zoned.

Judgment was thereupon rendered, enjoining appellants from enforcing regulations relative to appellees and their property; commanding the defendants to desist and refrain from interfering with the improvement of said premises for a commercial use.

Appellees herein (plaintiffs below) are Hiram F. Lively, administrator, of the estate of G. C. Fuqua, decedent, and three others (heirs of said decedent); appellants being the Dallas City Councilmen, its Building Inspector, City Manager, and members of the Board of Adjustment. It had been alleged and proven by the lot owners that their application to the Plan Commission and City Council, for an amendment of the ordinance and change of their property classification to local retail business, was denied upon hearings; also, that the City Building Inspector had refused application for permit to erect the oil station, on the sole ground that the zoning law prohibited such construction, and appeal to the Adjustment Board had been taken without avail. Appellees' prayer for injunctive relief was alternately for a writ of mandamus to compel from proper officials the issuance of such permit.

The particular lot (described as No. 34, block 3447, situated in the Oak Cliff section of Dallas) is in the shape of a long triangle, 210 feet on the south side, 200 feet on the north or northeast side, 96.6 feet on the west side and 24 feet on the east. Along its south boundary line is Tenth Street Boulevard, a paved and curbed thoroughfare, 115 feet wide, with parkway through the center, separating east and westbound traffic; on the north side is Jefferson Avenue, 100 feet wide, paved except the center part, which is occupied by a double-track street car line, poles and wires, such space separating east and westbound traffic; to the east of lot 34 (adjoining its 24-foot end) is a wide expanse of pavement, indicating the convergence of Jefferson and Tenth Street Boulevard; and coming into such intersection, about 200 feet east of the Fuqua lot, is Rosemont, running north and south. Adjacent to the west is another lot (No. 33) owned by appellees, fronting 50 feet on Tenth Street Boulevard, also extending through to Jefferson. Each of the two cross streets west of and parallel to Rosemont (Waverly and Brighton) deadend at Tenth to the south and Jefferson to the north; the third street to the west (Marlborough) being the next thoroughfare west of Rosemont, crossing both Tenth Street Boulevard and Jefferson. This entire block fronting west, as is seen, on Marlborough, with appellees' land as the extreme eastern tip, has Tenth Street Boulevard abutting on the south and Jefferson Avenue on the north side, both constantly used highways. The lot in suit appears from the exhibits to be of the same size and shape as when platted by the owner of that particular addition in 1913, when

it and adjacent property were restricted to residence uses. Such initial and subsequent deed restrictions expired about the year 1933, but prior thereto, the zoning statutes had been enacted, Acts 1927, 40th Leg., Art. 1011a, et seq., Vernon's Ann.Civ.St., under which the Dallas Zoning ordinance (No. 2052), passed in 1929, had again classified the lot for residence uses. From the evidence, it appears that some 25 or 30 years ago, a two-story residence had been built on lot No. 33, with about ten feet over on the premises in question, where G. C. Fuqua had lived until his death; but that such building was uninhabitable at date of trial.

The property in the vicinity of appellees', or plaintiffs', lot is shown to be devoted to residence uses, due, presumably, to original deed restrictions and the subsequent zoning classification here under attack; the major changes wrought by time, and the steady development of the City to the west, being the establishment of an oil station at the general intersection of Tenth Street Boulevard, Jefferson and Rosemont Streets in 1929, prior to passage of aforesaid ordinance. (The business just described, it is proper to note, was the subject matter involved in Scott v. Champion Building Co., 28 S.W.2d 178, where this court first sustained comprehensive zoning). Additional changes begin about 100 feet back of lot 33 and along the southeast line of Jefferson Avenue, consisting first of apartments over garages, and, farther along, various business houses up to the intersection of Marlborough Street, where appears a retail business district. West of the Magnolia oil station just mentioned, and facing Tenth Street Boulevard in the vicinity of plaintiffs' lot, are residences; a similar situation exists beyond lot 33, west to Marlborough; while across Jefferson, are residences facing intersecting streets already named, viz: Waverly and Rosemont.

The zoning ordinance of appellant municipality divided all property within its confines into six use districts, appellees' lot being classified as "B" (dwelling); and prohibiting the erection or alteration of any building, except in conformity with the use regulations prescribed for the particular district. Appellees were thereby restricted under Sec. 3 to dwelling district uses, and, so far as important here, to one-family or two-family dwellings. The further provisions of Sec. 11 require a minimum fore and rear yard depth of 25 feet; and in no case, less than a front yard depth of 10 feet to the street line. Section 5 (local retail district) expressly permitted construction of gasoline filling stations; and under authority further granted by the ordinance, the City Council could change district boundaries by first submitting the proposal to the City Plan Commission for recommendation and report. Public hearings followed and, unless the proposed change be approved by the Plan Commission, or in case of protest by a percentage of adjacent property owners, a favorable action on any such amendment must receive a three-fourths vote of the Council. The City's Board of Adjustment, authorized by Art. 1011g, Vernon's Ann.Civ.St., and local ordinances, also has power to grant exceptions in case of unnecessary hardship on affected property, but not to the extent of altering district lines.

Appellees' sole complaint, of course, is the alleged disastrous effect of the particular zoning classification on their property, which the City Council, functioning in its governmental capacity, has refused to correct; and the evidence, physical facts and conditions are arrayed as demonstrating conclusively an arbitrary, unreasonable exercise of appellants' police power, to the extent of confiscation. It is argued that mixed questions of law and fact are presented, involving their rights, which the jury findings have settled; the only question before this court being sufficiency of the evidence to support said verdict and consequent judgment.

Plaintiffs' principal testimony was adduced from reputable real estate men, none living, however, in the vicinity under examination. All testified to facts from which the jury could reasonably have based its widely diverse valuation of the same lot, if available for a commercial purpose, in contrast to a residence use. Appellees' witnesses further stated, in substance, that the operation of a filling station on the lot would not affect adjoining property valuations, with no increase of traffic or fire hazards, or other disturbance of the neighborhood peace and quiet; and considering the angular shape of the lot, offsets required in building regulations, its narrow limits abutting on the three well traveled streets above named, that any improvement thereof for residence use would be wholly unprofitable. On the other hand, it was elicited from a witness for appellees,

upon cross examination, that the lot could be utilized for a single or two-family dwelling; while city witnesses, neighborhood residents, voiced the opinion generally that an oil station on the Fuqua lot would accentuate noises, vehicular congestion and traffic hazards; that the increase of artificial lights, due to night operation of the station, would be a further annoyance, and that all these factors would tend to affect adversely the value of their property. It has been judicially determined that such business constitutes a fire hazard. Scott v. Champion Bldg. Co., supra; Lombardo v. City of Dallas, Tex.Civ. App., 47 S.W.2d 495, affirmed, 124 Tex. 1, 73 S.W.2d 475.

■■■ Appellees concede the ordinance to be, in its general aspects, valid; complaining only of its immediate and allegedly oppressive effect. They contend, the fact situation having been determined by a jury, it follows, as a matter of law, (1) that the restriction is not shown to have any real or substantial bearing on the public health, safety, morals, or general welfare; (2) the finding of values is such as to demonstrate the premises to be practically worthless for the designated use; and (3) appellees' classification is thereby condemned as unreasonable, arbitrary and void. The judgment of a court and jury are thus substituted for that of a city council acting in its legislative capacity; and our sole concern here is whether this exercise of judicial power is justified by the record. An attack upon any regulatory measure of a municipality is usually subject to the following well-settled rules: "The legislative body may determine in the first instance whether or not facts or conditions exist warranting a classification; and its determination of that issue cannot be disturbed in the absence of a clear showing that there is no reasonable basis therefor. The presumption is in favor of the validity of the ordinance. It will be presumed, in the absence of a clear showing to the contrary, that the governing body had sufficient reason, in view of local conditions, to make the classification which they have made; and if there could have existed a state of facts justifying the classification or restriction complained of, the courts will assume that it existed. The burden of establishing its discriminatory character is upon a person attacking it on that ground; and any reasonable doubts as to the validity of the classification will be resolved in favor of its validity." 30 T.J. p. 132, Sec. 61.

■■■ Without exception, these familiar principles have been applied to zoning ordinances emanating from an authorized police power. Otherwise expressed, a clear abuse of municipal discretion must appear as a predicate for judicial interference. King v. Guerra, Tex.Civ.App., 1 S.W.2d 373, writ refused; Lombardo v. City of Dallas, Tex.Civ.App., 47 S.W.2d 495, affirmed 124 Tex. 1, 73 S.W.2d 475; City of San Antonio v. Zogheib, Tex.Com. App., 101 S.W.2d 539; Luse v. City of Dallas, Tex.Civ.App., 131 S.W.2d 1079, writ refused; Connor v. City of University Park, Tex.Civ.App., 142 S.W.2d 706, writ refused; City of Corpus Christi v. Jones, Tex.Civ.App., 144 S.W.2d 388, writ dismissed; City of University Park v. Hoblitzelle, Tex.Civ.App., 150 S.W.2d 169, writ dismissed; Annotations, Washington ex rel., etc., v. Roberge, 86 A.L.R. 659. To sustain charges that the municipal judgment is arbitrary and unreasonable in its effect upon his property (it is stated in King v. Guerra, supra [1 S.W.2d 376]), "* * * the extraordinary burden rests upon appellee to show that no *conclusive,* or even *controversial* or issuable, facts or conditions existed which would authorize the governing board of the municipality to exercise the discretion confided to it by a valid ordinance in determining a matter of purely governmental policy. * * * So, if it can be said that the evidence in this case raised the issue of the truth of any of the material facts upon which the board refused a permit, then a sufficient answer is that the board were the triers of those facts, and their finding was conclusive and may not be substituted by the finding of a jury." (Italics ours).

■■■ A careful study of this record convinces us that appellees have not met the "extraordinary burden" required of them under adjudicated cases, the Council's refusal to amend the ordinance having support in the record. Appellant witnesses testified that the premises could be devoted to a residence use, the resulting investment being undoubtedly of less value; but, as the cited cases reiterate, such is not the test. Likewise, it is obvious that debatable questions exist in fire and traffic hazards, thus invoking a clear exercise of discretion. Appellees assert equities, referable mainly to the shape of the lot; but

thus it was platted in the beginning; and marginal cases are, unfortunately, coincident with municipal zoning. Leventhal v. District of Columbia, 69 App.D.C. 229, 100 F.2d 94; Miller v. Board of Public Works, 195 Cal. 477, 234 P. 381, 38 A.L.R. 1479. However, where, as here, the matters in controversy have been submitted to a jury, appellees thereby concede the existence of issuable facts. And, "If reasonable minds differ as to whether or not a particular restriction has a substantial relationship to the public health, safety, morals or general welfare, the restriction must stand as a valid exercise of the police power." City of Corpus Christi v. Jones, supra [144 S. W.2d 399].

It is our conclusion that the instant facts in no wise place appellees within the exceptional circumstances illustrated by City of West University Place v. Ellis, 134 Tex. 222, 134 S.W.2d 1038. To the contrary, plaintiffs' case is comparable to the fact situation arising in City of San Antonio v. Zogheib, supra [101 S.W.2d 542], where Judge Taylor, speaking for the court, said: "There is evidence upon which reasonable minds might have differed as to the wisdom or justice of the refusal of the permit, but there is none that the commissioners did not honestly believe from the facts that a hazard would be created from the operation of the station that it was their duty to prevent. The trial court was in error in submitting the matter to the jury for its determination."

Appellants' first four propositions must be sustained, rendering unnecessary a disposition of other assignments. The judgment below is therefore reversed and here rendered in favor of all defendants; also dissolving the existing injunction against the City of Dallas, its Councilmen, administrative boards and officers.

Reversed and rendered, with instructions.

## On Rehearing.

Rehearing denied.

LOONEY, Justice (dissenting).

On rehearing, I have reached the conclusion that the judgment below should have been affirmed rather than reversed and rendered. I am in harmony with the ruling principles of law announced in the majority opinion, but dissent from its fact conclusion in stating that appellees did not meet the "extraordinary burden" required of them under the adjudicated cases.

As set out in the majority opinion, the jury found that the property in question, by reason of its shape, size and location, is not suitable for the purpose for which it is now zoned; that its reasonable market value, if limited to the use for which it is at present zoned, is $500, and that its reasonable market value, if permitted to be used for the purpose of a gasoline filling station, is $12,500.

In its judgment, the trial court concluded that, if restricted and limited to the use for which it is now zoned, the reasonable market value of the property is $500; that the reasonable market value of the property, if permitted to be used for the purposes of a gasoline filling station, is $12,500, and concluded as a matter of law that: " * * * said restrictions as applied to plaintiffs' property are not an essential part of the Zoning Plan of the City of Dallas and are not necessary for the peace, health, safety or the general welfare of the public; and that said Ordinance, as applied to said property is unreasonable, oppressive and arbitrary and imposes a special, unnecessary and unreasonable hardship on plaintiffs, and permanently so restricts the use of said property that it cannot be used for any reasonable purpose, and that said Ordinance as applied to plaintiffs' property is confiscatory, invalid and unenforceable; and that the action of the City Council of the City of Dallas in refusing to change the classification of said property was unreasonable, arbitrary and discriminatory."

That these findings and conclusions by court and jury were overwhelmingly established, a review of the evidence, in my opinion, should leave no reasonable doubt. They imply that, at present, the property in question, owing to the restrictions of the zoning ordinance, cannot be used for any practicable or profitable purpose, and that its value, if limited to its present permitted use, is but a fraction of the value it would take on if permitted to be used for the business purpose sought; the disparity being so great as to shock one's sense of justice, and impel the conclusion that property is practically worthless for the designated uses, hence, it would follow that the action of the municipal authorities, in denying appellees the relief sought, was arbitrary, unreasonable, confiscatory, not zoning in any proper or legal sense, but the taking of property without due process and without just compensation, in violation

900

of both the State and Federal Constitutions.

As the majority opinion does not contain a statement of the evidence bearing upon the pivotal issues in the case, merely stating conclusions, at the risk of being thought verbose and tedious, I shall endeavor to set out the evidence at length. A plat, taken from the official map of the City of Dallas, that reveals the location of the triangular strip of land in question, its shape, size, surroundings and environment, is made a part of this opinion, and is as follows:

way in center upon which trees are growing; heavily traveled, the east and westbound traffic being separated; and its northeast side abuts upon Jefferson Avenue, 100 ft. wide, State highway, through artery of traffic, heavily traveled; its east and west traffic divided by a double street car track down the center; the traffic on these two streets, Jefferson and Tenth, converges at the east end of the lot in question, which commingles with the traffic on Rosemont, extending north and south, 60 ft. in width; there being located diagonally across Tenth Street, southeast of the

The property in question is vacant, although lot 33, owned by the Fuqua Estate, has upon it an old vacant, abandoned and decaying residence, that extends over about ten feet on the lot in question; no other improvements have ever been constructed upon it. As revealed by the plat, the lot, No. 34, is 96.6 ft. wide at its west end, approximately 200 ft. long, and diminishes in width with each lineal foot approximately 36/100 of a foot until, at its eastern extremity, it is only 24 ft. in width; its south side abuts upon Tenth Street Boulevard, 115 ft. in width, park-

eastern point of the land in question, a gasoline filling station belonging to the Magnolia Company.

The Zoning Ordinance, Sec. 11, B Area for Dwelling Districts, provides that, the front yard shall have a depth minimum of 25 ft., and, as applied to the lot in question, a depth minimum of 25 ft. for the rear yard and a minimum side yard line of 3 ft.; and in Sec. 12, C Area, Apartment District, there is required a minimum depth of 25 ft. for front yard, but need not exceed 20% of the depth of the lot; and a rear yard minimum of 25 ft., but need

not exceed 20% of the depth of the lot, except for a building not over one-story in height, the minimum depth shall be 12 ft.

It was with reference to the triangular strip of land, as revealed by the plat, that the witnesses testified:

Mr. W. H. Benners, Jr., in the real estate business in the City of Dallas for twenty-one years, acquainted with the property in question, testified that he did not think the lot, limited for use for dwelling purposes, had any market value at all, or for any use permitted in a dwelling district under the Zoning Ordinance; that its value, if permitted to be used for business purposes, would be from $12,500 to $15,-000. After referring to the restrictions for buildings within a dwelling district, the witness said the frontage, or setback, of a building located in the block fronting on Tenth Street was 25 feet, and that a building on the lot would have to set back 25 feet from the property line, and, having in mind the area restrictions, there would be no market value for this lot for dwelling purposes; that a building placed on the lot in compliance with the restrictions, would have no market value; that the area is in such odd shape it would not appeal to a purchaser of residential property, and if improved, would have to be disposed of at a sacrifice; and the same condition would exist if an apartment should be erected upon the property; that there is a double street car track running down the center of Jefferson Avenue, a state highway, heavily traveled, through artery for traffic to the western part of the county and into the downtown business area; that Rosemont Street is also heavily traveled, and Tenth Street Boulevard is one of the major trafficways for suburban property, and leads into Jefferson from the west; that headlights of automobiles traveling west on Jefferson and westward on Tenth Street Boulevard at night would shine upon every part of this property; that he has had about ten years' experience appraising the value of locations for filling stations, determining whether they are desirable or undesirable; that it would be possible to arrange pumps on the lot in question in such a manner that traffic headed east on Jefferson and west on Tenth Street could be served without having to cross any lane of traffic.

Max Ploeger, Jr., twenty-seven years' experience in real estate business in Dallas and Oak Cliff, acquainted with the property in question, testified that, if re-stricted to dwelling house purposes, the market value of the property in question would be very little; that is, from $1,000 to $1,500; that it is suitable for a filling station and if permitted to be used for that purpose, would be worth from $12,-500 to $15,000.

S. Raymond Pitcock, twenty-one years in the real estate business in Dallas, acquainted with the property in question, testified in substance that, if 25 feet should be taken off at the front and 20 feet at the back, there would not be left enough room to build a residence on the lot, suitable for rental purposes, or to live in; that a home built on the lot would have considerable drawbacks in the way of noise and lights, and that, taking all these things into consideration, the property is not at all suitable for dwelling purposes.

Clyde Wherry, twenty years' experience in the real estate business, acquainted with real estate values in Oak Cliff, acquainted with the triangular strip of land in question, testified in substance that its value, if limited to dwelling purposes, is $800 to $1,000 at the outside; that you could not get a building on that lot, in that shape, that would make a very good investment, or make a very good return, in view of the restrictions; that there is not enough room; that it is exceedingly doubtful if a dwelling erected thereon would bring sufficient return to justify the improvement; assuming that the lot can be used for a gasoline filling station, its market value would be $10,000; that such a station located upon the lot would not detrimentally affect or be hurtful to residential property in the neighborhood; that he would not give $500 to build a house on it to sell; that a desirable house could not be constructed on the lot; that at one time, witness attempted to work out a deal to build a house on the lot, but it was unsuited for a dwelling house, for the reason that traffic thoroughfares are on each side and a dwelling erected upon it would be sitting on the point where the heavy traffic is on both sides, and near a corner where there is a lot of turning done, and lights are thrown constantly at night, which would be flaring on the place, rendering it unsuitable as a place upon which to reside.

J. H. Carmichael, twenty-five years' experience in the real estate business in Dallas, familiar with the triangular strip of land in question, and its market value,

testified that he didn't think it had much market value for residential purposes; that he would estimate its total value for such purposes at about $1,250; that the location of the property with reference to surrounding streets would have a detrimental effect upon its value for a dwelling place; and that it would have no more value as an apartment house than for a single dwelling; that if permitted to be used for a gasoline filling station, or any other business, its value, for the first 100 feet would be $100 a front foot, and the next 50 feet would not have any value at all and would not be useful; that he would not consider it a sound investment to put any residential improvements on it whatever. While this witness testified that there could be found, at the west end of the lot, sufficient ground space upon which to erect a residence, it would not. be practicable and would not be a paying investment.

Albert Typel, a registered architect, familiar with the market cost of construction, familiar with the property in question, the present trend of general public in relation to the construction or location of buildings generally in demand for residences; deals with parties who are prospective buyers and builders of residences; testified that the property in question is not suitable for dwelling purposes; that while you could put a house on the lot, it is not suitable or desirable; because of its shape, combined with its location, it is exposed, front and back; there is no driveway to the property; if the dwelling faces Tenth Street, it would be exposed to Jefferson, a heavily traveled thoroughfare with street cars; that it would be like living in a birdcage, or in a showcase; that it would not be desirable to a person seeking a residence, and that it would not be a paying investment.

Edgar Wells, called by appellants, but induced to testify by Mr. DeGuire, who owns considerable business property in the vicinity, after testifying that he had been in the real estate business for seven years, in the mercantile business for a number of years, returned to the real estate business, and in the real estate business altogether fourteen years; acquainted with the property in question, and of opinion that it was worth from $4,000 to $5,000 for residential purposes, or about $6,000 for an apartment house; however, on cross examination, betraying a want of familiarity with the building restrictions,

admitted he was not competent to testify either as to the value of the property, or its suitability for dwelling purposes; saying: "I did not come down here to testify as an expert witness. If I had I would be properly prepared to answer your questions. I am not testifying as an expert witness. If I had known I was going to be required to testify as an expert witness I would be properly prepared, but I am not prepared to answer those questions. I have a different idea from anything you have asked me."

No other witness gave testimony in regard to the value of the property; so, excluding the testimony of the witness Wells, shown to be incompetent, especially to testify as to values, the testimony of the other witnesses constitutes the entire evidence in regard to the value of the property for residence and for business purposes, from which the court and jury made their findings. Although varying, the testimony of these witnesses is to the same effect and, in my opinion, sustains the findings of court and jury heretofore set out; in truth, a finding having a different meaning or legal import would not have been authorized.

The witness Floyd's testimony related to the probable injurious effect operation of a filling station located on the lot in question would have on residence property in the neighborhood. On cross examination, asked as to the desirability of the strip of land in question for dwelling purposes, answered: "It would not be the most desirable building location for a residence"; asked, "Would you like to build a house on it and live in it? * * * A. Very likely I would not"; asked, "You would not try to sell it to any of your neighbors for a house either, would you? A. I don't know that I would." As will be observed, the testimony of this witness, called by appellants, also discredited the lot as a suitable location for a dwelling.

Mrs. Castleberry, witness for appellants, thought her home would be rendered less comfortable if a filling station were located and operated on the lot in question. Mrs. Rose, called by appellants, testified that she thought the filling station, located and operated on the lot, would disturb the peace and quiet of her home, located third house west of the Fuqua property on the north side of Tenth Street; however, this witness testified that her husband thought differently and endorsed

the application of appellees to have the zoning of the lot changed. Mr. Reagan, also called by appellants, resides west on Tenth Street, south of the property in question; testified that, in his opinion, the traffic hazard would be increased by the operation of a filling station on the lot in question, and would interfere with the peace and quiet of the neighborhood.

The only witness who testified that the property was best suited for a dwelling was A. L. DeGuire. However, this witness admitted that he was adversely interested, being the owner of business property in the vicinity and had vigorously opposed the application of the Fuqua Estate to have the zoning of the property changed; testified further that he held for collection a paving claim against the Fuqua Estate, for the collection of which he would be paid a commission; had proposed to attorneys representing the Fuqua Estate that he would withdraw all opposition to the rezoning of the property, if the paving claim were paid, stating, "I will do the same right now; if you will pay my bill I will withdraw from the case; if you will pay that off, I will withdraw from the case right now." Under its authority to judge of the credibility of the witnesses and the weight to be given their testimony, the jury very properly could have disregarded the testimony of this witness altogether, and doubtless did. All the evidence in its material aspects has been reproduced, which, in my opinion, without material conflict, shows that for dwelling purposes, the property is practically worthless, and further, by an overwhelming preponderance of credible evidence, shows that the lot in question is unsuited for dwelling purposes.

The trial court found, and in fact it was admitted, that the building inspector and Board of Adjustment of the City refused to issue to appellees a permit for erection of a building on said property to be used as a gasoline filling station, such refusal being based on the sole ground that the Zoning Ordinance prohibited the erection of such building and such use of said property, which was followed by the City Counsel denying appellees the relief sought.

The majority opinion states that, " * * * it was elicited from a witness for appellees, upon cross examination, that the lot could be utilized for a single or two-family dwelling; * * *." In fact, two of appellees' witnesses, Messrs. Carmichael and Typel, testified to that effect. Each testified, in effect, that ground room or space could be found on the lot for a dwelling but each, as heretofore shown, condemned its suitability for that purpose. Carmichael said it would not be a sound investment, and Typel, in effect, that a dwelling located on the lot would not be livable or attractive to persons seeking a residence.

The majority opinion also states that, "Appellant witnesses testified that the premises could be devoted to a residence use, the resulting investment being undoubtedly of less value; * * *." There has heretofore been set forth in this opinion the testimony of appellants' witnesses bearing upon the desirability of the strip of land for dwelling purposes. As shown, the witness Wells, induced by the witness DeGuire to appear and testify, showed a lack of familiarity with the setback restrictions or requirements of the Zoning Ordinance, and admitted that he was not qualified to testify as an expert. Mr. Floyd, another witness called by appellants, as before shown, gave no testimony that he thought the property desirable for dwelling purposes, his testimony being to the contrary. The only other witness called by appellants to testify on the subject was DeGuire, whose adverse interest and probable animus, because disappointed in collecting the paving claim, tended to, and in the estimation of the jury doubtless did, destroy the probative value of his testimony.

I think the conclusion inescapable that the findings of court and jury are overwhelmingly sustained, that the value of appellees' property, by reason of the zoning restrictions, is diminished to such an extent as amounts to confiscation, and results in depriving them of its value without due process of law and without just compensation, and that the action of the municipal authorities in the premises was unreasonable, arbitrary and violative of both the Federal and State Constitutions, hence, that the Zoning Ordinance, as applied to appellees' property, is invalid and should be held ineffective.

A case on the facts, to all intents and purposes the same as the instant case, was Tews v. Woolhiser, 352 Ill. 212, 185 N.E. 827, 828, 831. The court held that the Zoning Ordinance, as applied to the property, was unreasonable and void, and, among other things, said: "It must not be overlooked that zoning which courts can approve must have as its basic purpose the setting aside of areas of property for specific uses. Zoning which admittedly

limits property to a use which cannot reasonably be made of it cannot be said to set aside such property to a use but constitutes the taking of such property without just compensation. Use of property is an element of ownership therein. Regardless of the opinion of zealots that property may properly, by zoning, be utterly destroyed without compensation, such principal finds no support in the genius of our government nor in the principles of justice as we know them. Such a doctrine shocks the sense of justice. If it be of public benefit that property remain open and unused, then certainly the public, and not private individuals, should bear the cost of reasonable compensation for such property under the rules of law governing the condemnation of private property for public use. It lies not within the power of a municipality to so zone property as to render it worthless. Such is not zoning—it is confiscation."

The Supreme Court of this State reached the same conclusion on a similar state of facts, in City of West University Place v. Ellis, 134 Tex. 222, 134 S.W.2d 1038, 1041. In that case was involved a vacant, unimproved lot, claimed to be suitable only for business purposes, and without value for resident purposes, although zoned as resident property. A suit was filed by the City of West University Place to restrain the owner from constructing a business house upon the lot, on the ground that such would be in contravention of the zoning ordinance. The trial court denied the relief sought and its judgment was affirmed by the Court of Civil Appeals, 118 S.W.2d 907; and the judgment of that court was affirmed by the Supreme Court. In the discussion, the court used the following language: "In our opinion, the judgment of the trial court may justly be sustained upon one or more theories. There is ample evidence to sustain a finding that defendant's lot is practically worthless as residential property. * * * While mere inconvenience and depreciation in value are not sufficient within themselves to constitute unreasonableness, yet it is settled that when depreciation in value is such as to make the property practically worthless for the designated use, this constitutes confiscation"; also quoted from Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321, by the Supreme Court of the United States, opinion by Mr. Justice Holmes, as follows: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act."

The authorities cited by appellants in support of the proposition that, change in value, due to zoning, is not a proper criterion, or at least not conclusive, by which to test the validity of a zoning ordinance, were cases differing materially from the case at bar; in that, in the cited cases, the property involved unquestionably was suitable for the purposes for which it was zoned, as in Lombardo v. City of Dallas, Tex.Civ.App., 47 S.W.2d 495; Id., 124 Tex. 1, 73 S.W.2d 475; Connor v. City of University Park, Tex.Civ.App., 142 S.W.2d 706, and City of University Park v. Hoblitzelle, Tex.Civ.App., 150 S.W.2d 169. However, we have just seen that, under the doctrine announced by our Supreme Court in City of University Place v. Ellis, supra, and in the other authorities cited, where change in value, due to zoning, rendered the property practically worthless, it does become a criterion and conclusive, by which to test the validity of the zoning ordinance.

But to conclude the whole matter,—if, notwithstanding the great difference between the rather negligible value of the lot for dwelling purposes and its greater value for business purposes, and notwithstanding its obvious unsuitability for profitable or enjoyable use, as zoned, the strip of land must remain vacant and unused, for the benefit of the community, as it has in the past and doubtless will in the future unless rezoned, I submit that justice should be done the owners, the property taken under the law of eminent domain, applied to the public use and paid for, but until the public authorities evince a purpose to condemn the property, the owners should be permitted to reap the benefits of their ownership, for, assuredly, somewhere in this Gilead, balm must be found.

For the reasons stated, I think appellees' motion for rehearing should be granted and the judgment of the court below affirmed.