

# THE ATTORNEY GENERAL
# OF TEXAS

AUSTIN, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

June 22, 1949

Hon. Beauford H. Jester
Governor of Texas
Capitol Building
Austin, Texas

Opinion No. V-847.

Re: Whether under H. B. 808
(1) Federal rent control
will be terminated and (2)
cities and towns may es-
tablish emergency rent
control within their limits.

Dear Governor Jester:

Your letter of June 14, 1949, states that House Bill
808 relating to rent decontrol has been passed by the Legislature
and is on your desk. Your letter further states:

"As I construe this Act, the Legislature
has undertaken in it to accomplish two things:
(1) To abolish federal rent control in
the State of Texas under the provisions of Sub-
section j-2 of the Housing and Rent Act of 1949.
(2) To provide for the imposition of
local rent control by municipalities, by action of
their governing bodies.

"I would be grateful for your opinion as
to whether these two objectives are or may be
accomplished under the terms of House Bill 808
in the light of existing federal law and the Texas
Constitution and Statutes."

House Bill 808 is brief. The substance of the bill
is contained in Sections 1 and 1a:

"Section 1. Rent control as established
by the Act of the Eighty-first Congress of the
United States, extending rent control for a peri-
od of fifteen (15) months from and after March
31, 1949, as further described in Housing and

Rent Act of 1949, H. R. 1731, is hereby abol-
ished in the State of Texas and is declared
to be no longer needed in the State of Texas,
and all Federal rent controls are hereby de-
clared no longer needed in the State of Texas.

"Sec. 1a. It is further provided how-
ever that the governing body of any city or
town may, by ordinance duly passed, finding
that a housing emergency exists, establish
rent control in such city or town for the dura-
tion of such housing emergency provided that
the ordinance so passed is approved by the
Governor of the State of Texas."

The answer to the first part of your question is in
the affirmative. The bill, if signed, will bring about the end of
Federal rent control in Texas. This will be true regardless of
our answer to your second question, since the bill contains a prop-
er severability clause.

Without going into the technicalities of the greatly
involved Federal Rent Control Act, as applicable here, it pro-
vides that if a state: (1) declares by law that Federal rent con-
trol is no longer necessary, and (2) so notifies the Federal Hous-
ing Expediter, all rent controls under the Federal act with refer-
ence to housing accommodations "shall be terminated on the 15th
day after receipt of such advice."[1]

---

[1] This is the substance of Section 204j(2) of the Housing and Rent
Act of 1947 as amended by Public Law 31, 81st Congress (1949).
That section reads:

"If any state by law declares that Fed-
eral rent control is no longer necessary in such
State or any part thereof and notifies the Hous-
ing Expediter of that fact, the Housing Expediter
shall immediately make public announcement to
the effect that he has been so advised. At the
same time all rent controls under this act, as
amended, with respect to housing accommoda-
tions within such State of part thereof shall be
terminated on the fifteenth day after receipt of
such advice."

Section 1 of House Bill 808 declares that "Federal rent controls . . . are no longer needed in the State of Texas." In this manner the Legislature accomplishes all that is required to come within the terms of the quoted paragraph. If and when this bill becomes law, all that would be necessary to accomplish the first objective would be the notification to the Housing Expediter of the legislative action, thus bringing into effect the provisions of Section 204j(2) of the Federal act.

Thereupon, the Federal control, under existing law, will be terminated. If this bill becomes law and the State is decontrolled, the Federal Housing Expediter cannot, under existing law, recontrol rents anywhere in Texas. This is because the Federal act also provides:

"(6) No maximum rents shall be established or reestablished under this subsection for any housing accommodations . . . in any state, city, town, village or locality in which rent controls under this title have been terminated pursuant to section 204(j)."[2] (Emphasis added).

Assuming the end of Federal control, we pass to your second inquiry as to whether the State can set up its own rent control in the manner directed by Section 1a of H. B. 808. We will first consider the matter directly from the standpoint of the power of the State itself.

It now appears to be generally established that when, as a result of an emergency, an acute and unprecedented shortage of housing accommodations is found to exist, legislation intended to prohibit the exaction of unjust and unreasonable rent during the emergency has been held to be a legitimate exercise of the police power of a state.[3] The State of New York after both World Wars has enacted legislation setting up rent control in New York City during the emergency. Its highest court and the

---

[2] Subsection 6 of Section 204i.

[3] Block v. Hirsh, 256 U.S. 135 (1921); Brown Holding Co. v. Feldman, 256 U.S. 170 (1921); 32 Am. Jur. 867; 52 C.J.S. 293; Annotations, 16 A.L.R. 178, 86 A.L.R. 1546, and 162 A.L.R. 202.

Supreme Court of the United States have upheld such legislation.[4] Congress also enacted similar legislation for the City of Washington, D.C., and the act was declared to be constitutional.[5] The validity of such legislation rests entirely upon the state of the emergency.

The Federal rent control law is based on the war power of Congress and the emergency situation created by the War. Its validity was upheld on that basis.[6] The United States Supreme Court in 1948 held that the emergency was not over with the termination of hostilities, and that the extension of the Federal rent control law was constitutional.[7] The Court took judicial notice that there existed sufficient facts to uphold the Congressional declaration that the emergency still existed.

The power of the states to act is not based on war power, but, as pointed out, upon their general police powers. This police power, in the rent control cases, has been held to depend also on the existence of an actual emergency, not merely a housing shortage unconnected with the general welfare, health, and safety of the people as a whole.

So the question as to whether there is an emergency is of primary importance. With regard to Federal rent control, the United States Supreme Court after the first World War held in 1924 (many years after the cessation of hostilities in 1918) that the Congressional declaration that there was still an emergency was not binding on the courts, and that such fact issue should be tried out on evidence to be presented. There are three cases by the Texas Courts which have invalidated legislation con-

---

[4] Twentieth Century Associates v. Waldman, 294 N.Y. 571, 63 N. E.2d 177 (1945), appeal den. 326 U.S. 696; People (Durham Realty Co.) v. La Fetra, 230 N.Y. 429, 130 N.E. 601 (1921); Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242 (1922); Brown Holding Co. v. Feldman, 256 U.S. 170 (1921); Finn v. Fifth Avenue Co., 153 F.2d 501 (C.C.A.2d 1946, cert. den. 328 U.S. 838); Application of Zohlman, 76 N.Y.S.2d 388 (N.Y. Sup. 1947).

[5] Block v. Hirsh, 256 U.S. 135 (1921).

[6] Bowles v. Willingham, 321 U.S. 503 (1944).

[7] Woods v. Miller, 333 U.S. 138 (1948).

trolling rents where the courts found no emergency to exist.[8]

The Texas cases involved the validity of legislation enacted in 1915 which was designed to aid the tenant farmer. It provided among other things that any rental in excess of one-third of the value of the grain and one-fourth of the cotton would be void; that the landlord would lose his lien, and that the tenant could recover double its full amount of the rent so paid. The act was not based on emergency police power. It was held that the statute was void as a taking of property without compensation and without "the due course of the law of the land" within Sections 17 and 19 of Article I of the Texas Constitution. It was also held to be a violation of the Fourteenth Amendment of the Federal Constitution.

In Culberson v. Ashford, one of the cases referred to above, the Texas Supreme Court recognized the holdings of the United States Supreme Court cases in the rent control cases above mentioned. Those cases were distinguished as being based "purely on the ground that they were emergency enactments and of limited duration . . ."

An earlier Texas case[9] on the same statute distinguished the two situations:

"To differentiate this case from the cases of People v. La Fetra and Block v. Hirsh it is necessary only to bear in mind that no abnormal situation prevailed calling for regulating contracts between rural landlords and tenants as was done by our Legislature, and that no pretense was made to repress a wide-spread evil arising out of an emergency and afflicting the entire public, impairing the public welfare; whereas, the other two acts were passed to relieve cru-

---

[8] Culberson v. Ashford, 118 Tex. 491, 18 S.W.2d 585 (1929); Miller v. Branch, 233 S.W. 1032 (Tex. Civ. App. 1921); Rumbo v. Winterrowd, 228 S.W. 258 (Tex. Civ. App. 1921).

[9] Miller v. Branch, 233 S.W. 1032 (Tex. Civ. App. 1921).

cial afflictions, pressing down upon the pub-
lic out of a grave abnormality, superinduced
by unprecedented and almost universal war-
fare, . . . And, as said, the legislative acts
in both instances cited expressly recognized
these conditions, and resorted to the police
power as a temporary means of dealing with
a temporary exigency, in its nature a present
emergency demanding action for the public
welfare."

This case was cited with approval by the Texas Su-
preme Court in Culberson v. Ashford, supra.

Taking the cases together, therefore, it is our con-
clusion that where there are found to be facts sufficient to consti-
tute an actual emergency, the enactment of legislation regulating
rent is a valid exercise of the police power of the State. The de-
cisions are based not only on the fact that housing was so critical
as to become affected with the public interest, but also upon the
emergency situation affecting the health and welfare of the com-
munity.[10] Where citizens are without shelter, or are forced to
live in a crowded condition, or where great numbers of people are
not able to obtain or retain healthful living quarters, there is a
problem of health and welfare for the whole community which the
courts say the State is not impotent to deal with. But the emer-
gency must exist in fact, and it is so specified in Section 1a of H.
B. 808.

Having concluded that rent control is a subject up-
on which the State may constitutionally act in certain far-reaching
emergencies, we turn to the second part of your question: Does
H. B. 808, in the light of the Texas Constitution and laws, accom-
plish its purpose, "to provide for the imposition of local rent con-
trol by municipalities, by action of their governing bodies?"

_____

[10]In upholding the New York Rent Law, Justice Crane wrote: "This
is not a case where the Legislature has undertaken to regulate
housing rates because such a business has become charged with a
public interest. . . . Circumstances due to war conditions have
created a peril to life and health, and with this the state has at-
tempted to deal until the peril has passed." Guttag v. Shatzkin,
130 N.E. 929 (Ct. of App. N.Y. 1921).

In 1912 the people of Texas adopted what is known as the "Home Rule Amendment" to their Constitution. Art. XI, Section 5. It is applicable to cities of over 5,000 population which have elected to come under its provisions. Under the Amendment and statutes enacted in harmony with it, those cities have very broad powers.[11] Such cities may not enact or enforce ordinances which violate any statutory or constitutional provisions. Nor may they enter a field of legislation that has been entered and occupied by general legislative enactments.[12]

Among the powers possessed by such cities is the general police power delegated to them by the people in the "Home Rule Amendment" and by the Legislature in Articles 1165 to 1176, V.C.S. Section 34 of Article 1175 empowers cities "to enforce all ordinances necessary to protect health, life and property, and to prevent and summarily abate and remove all nuisances and to preserve and enforce the good government, order and security of the city and its inhabitants."

Article 1176 further provides that "the enumeration of powers hereinabove made shall never be construed to preclude, by implication or otherwise, any such city from exercising the powers incident to the enjoyment of local self-government, provided that such powers shall not be inhibited by the State Constitution."

This power is to be used, among other things, for the public health, safety, and morals, and many related purposes. As related to the problem at hand, the police power is commonly

---

[11] "Beyond all question a home rule city acts by authority directly conferred by the Constitution and not through power conferred by the Legislature." City of El Paso v. Ascarate, 209 S.W.2d 989 (Tex. Civ. App. 1947, error ref'd.) "The amendment constitutes the rule of the local inhabitants of the city, and it is no longer necessary for the Legislature to confer powers on them to act, or is it necessary to look to the acts of the Legislature for a grant of power; only limitations on the power to act need be considered." Yellow Cab Transit Co. v. Tuck, 115 S.W.2d 455 (Tex. Civ. App. 1938, error ref'd.)

[12] Prescott v. City of Borger, 158 S.W.2d 578 (Tex. Civ. App. 1942, error ref'd.)

used to regulate the size, height, and location of buildings in certain areas, to fix zones, to require sanitary facilities in buildings, to require fire exits and fire escapes in public buildings, to provide for slum clearance and low cost public housing, to promulgate and carry out regulations to safeguard public morals, to control indecent practices, gambling, lotteries, to prevent extortion and oppression, to regulate public conveyances, and so forth.

The police power of "Home Rule" cities has been tested in our courts, and where it has been reasonably exercised, it has been very generally upheld.[13] For example, cities have been upheld in their power to provide for zoning,[14] to inspect food,[15] and to enact various other ordinances for the public health and welfare.[16] The Texas Supreme Court in Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475, adopted the following language:

"The doctrine has long been established that the municipality may, under delegated police power, exercise reasonable supervision and control over all kinds of business and property within the corporate limits whenever necessary for the public health, safety, morals, or general welfare. . . ."

Though their powers are not as broad or extensive, cities and towns which are not "Home Rule" but are incorporated under the general laws, Articles 961 V.C.S. et seq., have been delegated appropriate police powers by the Legislature.[17] Thus Article 962 provides that such incorporated cities:

---

[13] 3 McQuillan on Municipal Corporations (Rev. Ed. 1943) 57, et seq.; 30 Tex. Jur. 119, et seq.

[14] Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475 (1934).

[15] City of Dallas v. City Packing Co., 86 S.W.2d 60 (Tex. Civ. App. 1935, error dism'd.)

[16] City of Dallas v. Smith, 130 Tex. 225, 107 S.W.2d 872 (1937).

[17] Such powers may be delegated by the Legislature to municipalities. 3 McQuillan on Municipal Corporations (Rev. Ed. 1943) 108; 11 Am. Jur. 943, Constitutional Law, Sec. 223; 16 C.J.S. 546, Constitutional Law, Sec. 178; Stoutenburgh v. Hennick, 129 U.S. 141 (1889); Cox v. City of Kinston, 8 S.E.2d 252 (N.C. Sup. 1940).

". . . may ordain and establish such
acts, laws, regulations and ordinances, not
inconsistent with the Constitution and laws
of this State, as shall be needful for the gov-
ernment, interest, welfare and good order of
said body politic and under the same name
shall be known in law . . ."

They have other enumerated powers in Article 1015.
Section la of H. B. 808 would be considered as an addition to such
specifically enumerated powers. It would constitute an additional
delegation of the police power to act in a housing emergency.

It is not necessary to decide whether either or both
these types of cities could independently enact rent control ordi-
nances in a dire emergency by exercise of their general police
power. House Bill 808 delegates that power to them. The specif-
ic provisions of Section la, when added to their broad police pow-
ers, would enable both these types of cities and towns to so act.
Of course, the Legislature does not undertake to apply Section la
to unincorporated towns and villages, since it is limited to those
cities and towns which can act by "ordinance" of its "governing
body."

We wish to repeat here that this power to enact
housing control ordinances is wholly dependent upon the actual
existence of some great emergency. And the emergency must,
under the cases, be closely associated with and affect the public
health, safety, morals, or general welfare. For example, it is
recited in an opinion of New York's highest court that when New
York in 1920 enacted its rent laws, there were upwards of 100,000
eviction suits actually pending in the courts of New York City;
each proceeding involved a family averaging 4 or 5 persons;
large numbers of people were forced to live in such crowded
conditions that actual health and moral problems were presented;
construction of housing facilities was at a standstill or was great-
ly insufficient because of the shortage of material due to the war;
many landlords were taking advantage of the situation; and those
tenants who could, paid exorbitant rents rather than to take the
risk of being unable to find other places of abode. The situation
was critical enough to warrant a special session of the New York
Legislature.[18] In upholding the law, it was pointed out that it was

---

[18] People ex rel. Durham Realty Co. v. La Fetra, 230 N.Y. 429,
130 N.E. 601.

an emergency measure which by its own terms was to remain in force for only two years.

On the other hand, where Congress sought to control rent in Washington, D.C., some six years after the end of World War I, and the validity of such action was challenged in the Supreme Court of the United States, Mr. Justice Holmes wrote concerning the weight to be given to the declaration by Congress that a sufficient emergency existed:

> "We repeat what was stated in Block v. Hirsh, 256 U.S. 135, 154, as to the respect due to a declaration of this kind by the legislature so far as it relates to present facts. But even as to them a Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared. . . . And still more obviously so far as this declaration looks to the future it can be no more than prophecy and is liable to be controlled by events. A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed. . . .

> ". . . In our opinion it is open to inquire whether the exigency still existed upon which the continued operation of the law depended. It is a matter of public knowledge that the Government has considerably diminished its demand for employees that was one of the great causes of the sudden afflux of people to Washington, and that other causes have lost at least much of their power. It is conceivable that, as is shown in an affidavit attached to the bill, extensive activity in building has added to the ease of finding an abode. If about all that remains of war conditions is the increased cost of living, that is not in itself a justification of the act."[18]

---

[18] Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924).

In this regard, the Texas Supreme Court wrote:

"A law which assumes to be a police regulation but deprives the citizen of the use of his property under the pretense of preserving the public health, safety, comfort, or welfare, when it is manifest that such is not the real object and purpose of the regulation, will be set aside as a clear and direct invasion of the right of property without any compensatory advantages." Spann v. City of Dallas, 111 Tex. 513, 235 S.W. at 513 (1921).

Again, the Texas Supreme Court has declared void the fixing of rents where there was no emergency. Culberson v. Ashford, 113 Tex. 491, 18 S.W.2d 585. This will serve to emphasize that the validity of these ordinances will absolutely depend upon the existence of a grave emergency, and that they will be valid only so long as such emergency exists. We are not here dealing with the regulation of rents as an ordinary measure to meet an ordinary housing shortage or high rents. The Texas Supreme Court has held that this may not be done, and the Legislature has not attempted to regulate housing under ordinary circumstances. House Bill 808 authorizes such action only upon a "finding that a housing emergency exists," and the courts will inquire into the actualities of such a finding. We have pointed out the type of emergency which must be found in order to justify use of the police powers of a city for such purposes. A mere "housing emergency" unconnected with the public health, welfare, safety or morals, would not justify such extraordinary use of the police powers to interfere with, take or regulate private property. Rent control in the latter case would be unconstitutional, and it is presumed that the Legislature intended to authorize control only in that type of "housing emergency" which would serve as a basis for constitutional exercise of such powers.

Assuming the finding of such a grave emergency as to warrant and justify the exercise of the police power to control housing, the ordinance of a city imposing such control would have to be very carefully drawn in order to be valid. It would have to provide adequate standards for the operation of the ordi-

nance[19] and provide for a fair rental and fair return on investments, and for adjustments in new and unusual situations; it must provide for trials on contested cases, with adequate provisions for notice, hearing and appeals, et cetera. Since H. B. 808 uses the word "housing," it is evident that the Legislature did not intend for commercial rent property to be controlled. What types of "housing" are to be controlled would have to be determined by the city depending on the type and extent of the emergency. Finally, the ordinance must be reasonable and must be executed in a reasonable manner. As stated by the Court of Civil Appeals:

> "While a city has the power to enact ordinances to protect the public health, and while ordinances are a valid exercise of the city's delegated police power under the Home Rule amendments, the power authorized under such ordinance cannot be exercised arbitrarily and unreasonably." City of Dallas v. City Packing Co., 86 S.W.2d 60 (1935, error dism'd.)

House Bill 808 contains a severability clause. So regardless of the validity or invalidity of Section 1a, the provision in Section 1 for the end of Federal rent control will stand. In any event, if and when this bill is signed and becomes effective, Federal rent control will be at an end in Texas.

## SUMMARY

1. House Bill 808, 51st Legislature, if and when signed and effective, will bring about the end of Federal rent control in Texas.

---

[19] In Spann v. City of Dallas, 111 Tex. 513, 235 S.W. 513 (1921), an ordinance prohibited any commercial building in a residential area except under certain circumstances. Among other reasons, the ordinance was held void because, "No rule or standard is given to govern the applicant in fashioning the design of his building or to govern the inspector in approving or rejecting it . . . This leaves the right to construct the building subject to the arbitrary discretion of the inspector and of itself renders the ordinance void." 235 S.W. at 517.

This is true regardless of the validity of Section la of the bill providing for municipal rent control where a housing emergency is found to exist in incorporated cities.

2. Section la of H. B. 808 authorizes incorporated cities and towns in Texas to establish rent control upon a finding that a housing emergency exists. That bill, together with their general police powers, give the cities the power to regulate housing only where there is such a grave emergency as to affect the health, welfare, safety or morality of the people of the city as a whole. This power may not be exercised in the absence of a clear showing of such a grave emergency. Whether such emergency exists is a question of fact to be determined by the governing body of the city or town in the first place. In the event of suit, the court may reexamine such finding, because the validity of such ordinances absolutely depends upon an emergency and is valid only so long as the emergency exists.

Yours very truly,

APPROVED:

*Price Daniel*

ATTORNEY GENERAL

ATTORNEY GENERAL OF TEXAS

By *Joe R. Greenhill*

Joe R. Greenhill
First Assistant

*E. Jacobson*

E. Jacobson
Assistant

JRG:EJ:erc